In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2654

DEBRA MCKINZEY,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09 CV 4024—**Joe Billy McDade**, *Judge.*

ARGUED FEBRUARY 10, 2011—DECIDED JUNE 3, 2011

Before MANION, EVANS, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* Debra McKinzey applied for Social Security disability benefits in 2004, but an administrative law judge found that she could perform light work and was thus not disabled. She challenges that determination. Despite some concerns over the ALJ's articulation of her reasons for denying McKinzey's claim, we find that the determination was amply sup-

ported by substantial evidence in the record and that remanding for further articulation would serve no purpose. We therefore affirm the decision of the district court and the ALJ.

I.

In November 2004, McKinzey filed an application for disability insurance benefits with the Social Security Administration, alleging an onset date of February 27, 2003. Her claim was initially denied in April and again on reconsideration in July 2005. She then requested a hearing with an ALJ, which was held two-and-a-half years later.

A. *The Hearing*

McKinzey testified that she was injured in 2001 while working at an Eagles supermarket and that this injury resulted in bilateral cubital tunnel syndrome—a compression of the ulnar nerve along the cubital tunnel on the outside of the elbow—and ulnar neuropathy. These injuries caused a 45% loss of use of one arm and 50% of the other. For the next couple of years, she continued to work at Eagles in less physically demanding positions. Finally, in 2003, she was unable to perform a job as a greeter and was laid off.

In 2004, she began a program to train as a dental hygienist, but was dropped from the program after completing her prerequisites because of problems with her

hands. She then attempted a radiology technician program, but could not pursue that either because she was at an elevated risk from radiation due to her previous bout with skin cancer. Finally, she enrolled in a program in electroencephalography (EEGs) and sleep studies. She was still enrolled in this program at the time of her hearing, but she was having difficulty with the clinical work due to problems with her hands and vision, and was not sure that she would be able to continue. McKinzey testified to numerous health problems and stated that the biggest impediments to her work were her fingers, her vision, and the loss of feeling in her feet due to Raynaud's syndrome, which limits the circulation to extremities and can cause numbness.

After McKinzey testified, the ALJ questioned the vocational expert, Dennis Gustafson. The ALJ asked him whether there were any jobs for a hypothetical 45-year-old with a high school education and some college, who was capable of doing light or sedentary work, with the ability to frequently lift 10 pounds and climb ramps or stairs, but who was limited to only occasional handling, fingering, or feeling with her hands, no climbing ladders, ropes, or scaffolding, and who had to avoid moderate exposure to vibrations and hazards. The ALJ and Gustafson then discussed McKinzey's testimony concerning her vision and concluded that the proper classification was a problem of visual accommodation (meaning a problem shifting focus from near objects to far) rather than visual acuity. The ALJ included this limitation in her hypothetical. Gustafson testified that such a hypothetical person would not be able to return to

any of McKinzey's past work. And although some customer service skills would be transferable, the hypothetical manipulative limitations would rule out any other work for such a person, absent specialized training. The ALJ stated that she would need to go back through the medical records to see if the limitations were warranted and then ended the hearing.

B. *Medical Records*

The medical records reveal that McKinzey has sought treatment for numerous health concerns. She has a history of skin cancer, and partially unsuccessful surgeries on her face and breast to remove the cancer have led to several cosmetic surgeries. She had some vision problems stemming from surgery on her eyes using a laser that was later recalled by the manufacturer. At various times, McKinzey has been assessed with ulnar neuropathy, cubital tunnel syndrome, mild degenerative joint disease in the spine, fibromyalgia, Raynaud's syndrome, fluctuating vision, vasomotor rhinitis (chronic runny nose), and depression and anxiety.

Her arm problems, which form the core of her evidence of disability, go back through 2001. Shortly after her work injury, McKinzey began seeing Dr. Thomas VonGillern, an orthopaedic specialist, for symptoms of constant tingling, numbness, cold fingers, and pain. Dr. VonGillern noted impressions of mild bilateral cubital tunnel. Following a nerve conduction study in 2002, McKinzey was assessed with mild to moderate bilateral ulnar neuropathy. Dr. VonGillern scheduled

her for surgery on her right ulnar nerve at her elbow and, in anticipation, gave her restrictions on bending, lifting, twisting, pushing, tearing, pinching, gripping, and squeezing. McKinzey, however, cancelled the surgery and stopped seeing Dr. VonGillern. When the ALJ questioned her on her decision to forego surgery, she replied both that her other doctors did not agree and that she had come to distrust Dr. VonGillern.

A few weeks after cancelling her surgery, McKinzey began seeing a neurosurgeon, Dr. David Udehn. His initial impression was that McKinzey had ulnar neuropathy and was not responding to conservative therapy. At that time, and again in June 2003, he recommended that she proceed with surgery as Dr. VonGillern had suggested. In November 2003, Dr. Udehn also recommended that McKinzey proceed with a functional capacity evaluation; that evaluation found that she could lift 10 pounds frequently and 20 pounds occasionally, occasionally climb ladders and crawl, and frequently bend, squat, kneel, and climb stairs. She could repetitively perform simple grasping but not firm grasping. In March 2004, Dr. Udehn again recommended surgery and then in May he referred McKinzey to Dr. Peter Pardubsky for a second opinion. Dr. Pardubsky also recommended surgery.

In March 2005, an occupational evaluation found that McKinzey had a full range of motion in the upper extremities but had some limitations on fine manipulations and that her gross manipulations might be limited by her low grip strength. In April 2005, at the request of

the Social Security Administration, state agency physician Dr. Francis Vincent performed a functional capacity assessment based on McKinzey's medical records. He noted that McKinzey could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk 6 hours out of an 8-hour workday, and sit 6 hours out of an 8-hour workday. Her ability to push and pull with her upper extremities was limited and she could not perform excessively repetitive movement of the elbows and hands. In addition, Dr. Vincent opined that McKinzey could only occasionally use her hands for feeling, fingering, or handling. A second state agency physician, Dr. William Conroy, affirmed Dr. Vincent's assessment. A chiropractic evaluation shortly after Dr. Vincent's opinion also stated that McKinzey was limited in the use of her hands.

After a May 2005 examination, Dr. Pardubsky again noted an impression of bilateral cubital tunnel syndrome and unstable ulnar nerves. But now he recommended surgery only if McKinzey's symptoms continued to worsen. Then, when Dr. Pardubsky saw her again in August 2005, his opinion changed significantly. He still noted an impression of bilateral ulnar neuropathy, but found McKinzey's examination benign, did not find further diagnostic work-up necessary, and now recommended against surgery. While he noted that she might have discomfort in her limbs, he did not see any progressive disabling process that would limit her. Moreover, he found that she could use her arms to the fullest extent possible.

In March 2006, McKinzey underwent a neurological evaluation with Dr. Robert Segura, which showed some evidence of ulnar nerve irritation bilaterally. The exam was followed by an electrodiagnostic nerve study of McKinzey's upper and lower limbs. The study showed no evidence of cubital tunnel syndrome (i.e., ulnar entrapment at the elbows). Other than a nerve entrapment near her ankle, McKinzey had no significant nerve conduction abnormalities.

In February 2007, McKinzey returned to Dr. Pardubsky with complaints of thumb pain. Dr. Pardubsky noted that McKinzey had full motion of her fingers, thumb, wrist, elbow, and shoulder. Although McKinzey was hesitant to move her thumb in some directions, after encouragement she demonstrated full motion. In addition, Dr. Pardubsky stated that McKinzey complained of an "intermittent tremor that appears to be voluntarily present when she discussed exam of her hands but is absent at rest." He concluded that McKinzey's ongoing subjective complaints were inconsistent with objective findings. Without any evidence of serious underlying pathology, he recommended against any further diagnostic or surgical intervention and suggested that McKinzey simply treat her symptoms.

C.  *ALJ's Decision*

The ALJ issued an unfavorable written decision in April 2008. She proceeded through the familiar five-step analysis. At step one, she found that McKinzey had not engaged in substantial gainful activity since the alleged

onset date of February 27, 2003. At steps two and three, she found that McKinzey had a severe combination of impairments—including fibromyalgia, degenerative disc disease, bilateral mild ulnar neuropathy, a history of multiple eye surgeries with dry eye syndrome, and monovision—but that her impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. The ALJ then found that McKinzey had the residual functional capacity to perform light work: she could lift up to 10 pounds frequently; she could not do work activity involving climbing ladders, ropes, or scaffolds, and could only frequently climb stairs or ramps; she could only occasionally bend, stoop, crouch, crawl, or kneel; she was limited to no more than frequent handling, fingering, and feeling with both hands; she was limited to moderate exposure to vibrations or hazards; and she required frequent accommodations for vision problems.

In making this residual functional capacity finding, the ALJ found that there was an underlying medically determinable physical impairment that could be expected to produce McKinzey's pain and other symptoms. But she also found that McKinzey was exaggerating her claims concerning the intensity, persistence, and limiting effects of her symptoms. Specifically, the ALJ found it inconsistent that McKinzey pursued several voluntary cosmetic surgeries but did not pursue surgery that three different specialists recommended to alleviate the symptoms of ulnar neuropathy and cubital tunnel syndrome. The ALJ also found McKinzey's functioning considerably greater than alleged: although her impairment

was essentially unchanged since the injury in 2001, she had worked for two years before the alleged onset date; further, she had maintained a level of activity since 2003 that was inconsistent with her alleged inability to work. Finally, the ALJ noted that "the record includes evidence strongly suggesting that the claimant has exaggerated symptoms and limitations."

At step four, the ALJ found that McKinzey was unable to perform any past relevant work. Finally, at step five, the ALJ consulted the medical vocational guidelines (known as the grids) and determined that there were jobs that exist in significant numbers in the national economy for someone with McKinzey's age, education, work experience, and residual functional capacity. Although she recognized the presence of some non-exertional limitations not accounted for in the grids, the ALJ found that those limitations had "little or no effect on the occupational base of light unskilled work." The ALJ thus concluded that McKinzey was not disabled and denied her application.

The Appeals Council denied McKinzey's request for review of the ALJ's decision in February 2009. In April 2009, McKinzey filed this suit against the Commissioner of Social Security in the district court, seeking review of the decision of the Social Security Administration under 42 U.S.C. § 405(g). In May 2010, the district court affirmed the Commissioner's decision and entered judgment against McKinzey. McKinzey appeals.

II.

When the Appeals Council denies a request for review, as it has here, we review the ALJ's determination as the final decision of the Commissioner of Social Security. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). We review de novo the district court's decision, and reverse an ALJ's determination only where it is not supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although we do not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner," we nonetheless conduct a critical review of the evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The ALJ must adequately discuss the issues and must build an "accurate and logical bridge from the evidence to his conclusion." *Id.*

McKinzey argues that the ALJ's discussion of the evidence was deficient in three respects. First, she argues that the ALJ did not discuss an opinion by a state agency physician regarding her limitations on her use of her hands. Second, she claims that the ALJ failed to account for non-exertional limitations (principally her vision impairments, but also environmental limitations and others) in determining that there were jobs she could do in the national economy. Finally, she argues that the ALJ's negative credibility determination is based on mischaracterizations of the evidence and unreasonable inferences. We review each issue in turn.

A.  *McKinzey's Credibility*

We start with McKinzey's last argument, that the ALJ erred in finding that McKinzey's account of the intensity and frequency of her symptoms lacked credibility. The ALJ did conclude that the objective medical evidence in the record *could* produce the symptoms of which McKinzey complained. And given the testimony of the vocational expert that there would be no jobs that a person with McKinzey's reported symptoms could do, the ALJ's credibility judgment was the determinative issue in this case. Had the ALJ found McKinzey credible, the decision would most likely have been favorable. Although we find some deficiencies in the ALJ's discussion of McKinzey's credibility, we conclude that the ALJ has pointed to sufficient evidence in the record to justify her negative determination.

Like any determination by the ALJ, the findings concerning McKinzey's credibility must be supported by substantial evidence. Further, the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *See Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). As long as the ALJ has explained her decision, this court "will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Skarbek*, 390 F.3d at 504.

McKinzey argues that the reasons that the ALJ gave for discounting her testimony regarding the severity of

her symptoms were defective. Specifically, she attacks the ALJ's credibility determination in three places. First, she argues that the ALJ improperly counted her decision to forego surgery against her. Second, she claims that the ALJ drew unreasonable inferences from the so-called cosmetic surgeries she underwent over the years. Finally, she asserts that the ALJ erred by holding McKinzey's pre-2003 work and her enrollment in college against her without taking into account the significant accommodations she required to pursue, ultimately unsuccessfully, those various vocations. McKinzey argues that these three errors compel a remand because the ALJ has not built the requisite logical bridge between the evidence and her conclusions.

We disagree. The ALJ's credibility determination was not without fault. Indeed, we see some merit in two out of three of McKinzey's attacks.[1] Despite her obligation to consider McKinzey's explanation for her failure to seek surgery before drawing an adverse inference, S.S.R. 96-7p, the ALJ did not explain why she discounted McKinzey's facially valid reason for declining surgery, namely that her physicians did not agree that it would

---

[1] Regarding the third argument—that the ALJ improperly considered what she labeled "cosmetic" surgeries against McKinzey—the ALJ explicitly noted the logical connection between McKinzey's willingness to undergo rather extensive surgery for non-disabling issues but her refusal to undergo recommended surgery that might have alleviated her allegedly severely disabling symptoms.

necessarily help, and could even hinder.[2] Further, McKinzey's unsuccessful attempts to pursue various vocations might just as easily provide corroboration that her impairments significantly limited her ability to work, as opposed to evidence that her ability was greater than she alleged.

But what McKinzey's account of the credibility determination leaves out is the final reason given by the ALJ, namely that, "[i]n addition, the record includes evidence strongly suggesting that claimant has exaggerated symptoms and limitations." This statement was supported by reference to Dr. Pardubsky's 2007 medical opinion, which in this case could be labeled a smoking gun: "Objective findings at this time do not correlate with [McKinzey's] ongoing subjective complaints." And—more damning for McKinzey's credibility—"she complains of an intermittent tremor that appears to be voluntarily present when she discussed exam of her hands but is absent at rest." In other words, in the opinion of her own treating specialist, McKinzey's claimed symptoms were contradicted by his clinical evaluation.

---

[2] The Commissioner and the district court suggest that the ALJ was justified in ignoring the explanation because, in their view, it contradicts another reason she gave and because the evidence in the record does not include opinions against surgery. But it was the ALJ's job, not the court's, to articulate the reasons for her decisions, as well as explore a claimant's asserted explanations for foregoing recommended treatments. S.S.R. 96-7p. In any event, this oversight is not a determining factor.

In light of the substantial evidence that McKinzey was exaggerating her symptoms even to a treating physician, we conclude that the ALJ's credibility determination was adequately supported by evidence in the record.

### B. *Dr. Vincent's Opinion*

Next, we consider McKinzey's argument that the ALJ failed to explain the weight she gave to the state agency physician's opinion that McKinzey could only occasionally use her hands for handling, fingering, or feeling. Generally speaking, an ALJ's "adequate discussion" of the issues need not contain "a complete written evaluation of every piece of evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). But when the evidence comes in the form of a medical opinion from a state agency physician, the agency's own regulations and rules require that the ALJ "not ignore these opinions and must explain the weight given to the opinions in their decisions." S.S.R. 96-6p; *see also* 20 C.F.R. § 404.1527(f).

McKinzey argues that the ALJ did fail to explain her treatment of these opinions, and that this failure alone requires us to remand the matter to the agency for further consideration. We agree with the former claim but not the latter. Dr. Vincent concluded, based solely on a review of the medical records to date, that McKinzey had the following exertional limitations: she could lift 20 pounds not more than occasionally and 10 pounds not more than frequently, could stand or sit no more than 6 hours in the course of an 8-hour day, and could not handle excessively repetitive activity. In addition,

Dr. Vincent found that McKinzey could only occasionally use her hands to handle, finger, or feel.[3]

While the ALJ was not required to follow Dr. Vincent's opinion, there is no indication in the record that she was even aware that a state agency physician—two, actually—had opined that McKinzey had significant limitations with her hands, much less that she gave this opinion proper consideration. The ALJ thus violated S.S.R. 96-6p, which is binding on ALJs, *see Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999), and leaves no room for doubt that the ALJ was required to consider Dr. Vincent's opinion. This was error.

But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). That would be a waste of time and resources for both the Commissioner and the claimant. Thus, we look at the evidence in the record to see if we can predict with great confidence what the result on remand will be. We note (yet again, see *Spiva*, 628 F.3d at 353 and the critical discussion therein) that the harmless error standard is not, as the Commissioner and district court

---

[3] Dr. Vincent also checked the box indicating that no manipulative limitations had been established, but this was very likely inadvertent in light of the specific limitations entered immediately thereafter. In any event, the ALJ did not discuss *either* "finding" of Dr. Vincent, so we have no way to know what the ALJ thought of the inconsistencies in the opinion.

seem to believe, an exercise in rationalizing the ALJ's decision and substituting our own hypothetical explanations for the ALJ's inadequate articulation. We have already concluded that the ALJ erred. The question before us is now prospective—can we say with great confidence what the ALJ would do on remand—rather than retrospective.

Here, a review of the records convinces us that no reasonable ALJ would reach a contrary decision on remand regarding McKinzey's manipulative limitations. While Dr. Vincent's opinion is entitled to consideration as a non-examining source, it does not carry significant weight in comparison to the opinion of a treating specialist like Dr. Pardubsky. 20 C.F.R. § 1527(d). Dr. Vincent reviewed only medical records, and notably could not have taken into account Dr. Pardubsky's opinion, based on his personal observation just a few months after Dr. Vincent's opinion, that McKinzey had no significant limitations in the use of her hands. Dr. Pardubsky's history of treating McKinzey, both before and after his August 2005 opinion, give his opinion singular weight and importance. Had the opinions been reversed—with Dr. Pardubsky opining that McKinzey *was* significantly limited in the use of her hands—we have no doubt that the ALJ would not have been free to prefer a contrary opinion from a state agency physician. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (outlining treating physician rule). In short, we find the ALJ's oversight harmless because although she failed to articulate her reasons for rejecting a portion of Dr. Vincent's opinion (or failed to notice that portion, whatever the case may be) the proper place

of that opinion in the context of the other evidence is clear. It would serve no purpose to remand this case to the ALJ for a statement of the obvious.

C. *Vision Impairments*

Finally, we turn to McKinzey's argument that the ALJ erred in determining that jobs exist in the national economy that McKinzey could perform. The medical vocational guideline grids provide a means for ALJs to determine whether a person with a particular claimant's exertional limitation—standing, walking, lifting, and the like—can perform any jobs in the national economy. (20 C.F.R. Part 404, Subpart P, Appendix 2 provides the grids and an introduction to their use). The presence of other, non-exertional limitations, not factored into the grids, may preclude an ALJ from relying on the grids and require a consultation with a vocation expert, but only when the non-exertional limitations "substantially reduce a range of work an individual can perform." *Luna v. Shalala*, 22 F.3d 687, 691, 692 (7th Cir. 1994). The ALJ found that McKinzey's additional non-exertional limitations "have little or no effect on the occupational base of unskilled light work" and did not consult a vocational expert. McKinzey argues that this was error; she points to a number of non-exertional limitations, but only her claim concerning her vision impairment merits discussion.

At the heart of this challenge is the ALJ's unexplained finding that McKinzey "requires frequent accommodation for vision problems." This finding, claims McKinzey,

is inconsistent with the ALJ's subsequent assertion that such "frequent accommodation" would have little or no effect on the light unskilled jobs available. Yet again, while we agree with McKinzey that the ALJ's decision was deficient in certain respects—we are left to guess at what "frequent accommodation" means[4]—we cannot conclude that any error here warrants a remand.

We would certainly prefer that the ALJ had provided some detail of what specific vision limitations and accommodations she found that McKinzey had. But here it appears obvious why the ALJ concluded that departing from the grids was unnecessary—and thus equally obvious that any remand would lead to the same result: nothing in the medical records or even in McKinzey's own testimony suggests the type of visual impairment that would have reasonably caused an ALJ to consult a vocational expert.

The two Social Security rulings most on point here, 83-14 and 85-15, suggest that in most cases, only visual impairments severe enough to cause safety concerns will have a significant impact on the occupational base of light unskilled work. S.S.R. 83-14 states that visual impairments that would cause a claimant "to be a hazard to self

---

[4] Some confusion may stem from the use of the term "accommodation" in a distinct sense at McKinzey's hearing: there, the vocational expert and the ALJ, having heard McKinzey describe her vision impairment, concluded she had limits on her visual "accommodation"—i.e., her ability to shift focus from near to far quickly—rather than problems of visual acuity.

and others—usually a constriction of visual fields rather than a loss of acuity—the manifestation of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc. will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work." S.S.R. 85-15 appears to go even slightly further: "as long as [a person] retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels."

The visual impairments suggested by the medical records and McKinzey's own testimony are hardly of the type or severity contemplated in the relevant Social Security rulings. The medical records cited monovision (one of her eyes was corrected to see distance and the other up close) and dry eye syndrome as causes for her fluctuating vision throughout the day, which the vocational expert and the ALJ took to mean difficulty shifting focus from near to far. McKinzey's own example of how she was limited by her vision was that she required extra time to take measurements during clinical work for her EEG and sleep study program. Moreover, McKinzey drove herself to the hearing with the ALJ, suggesting that her visual impairments did not render her a danger to self and others. Based on the criteria outlined in the relevant Social Security rulings, no ALJ would reasonably find that McKinzey's need for extra time to shift focus from near to far would "significantly impact" the occupational base for light unskilled work.

### III.

Although we have noted some problems with the way the ALJ articulated her unfavorable determination—especially in her failure to acknowledge that Dr. Vincent's opinion was contrary to her finding and explain the weight she gave to that opinion—we have also concluded that remanding this case to the agency would serve no purpose in light of the overwhelming evidence supporting the ALJ's decision. Accordingly, we AFFIRM the district court's judgment and the ALJ's determination.