NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued December 12, 2012
Decided December 21, 2012

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 12-2364

| | |
|---|---|
| HELEN E. HENKE, | Appeal from the United States District |
|     *Plaintiff-Appellant,* | Court for the Western District of Wisconsin. |
| | |
|     *v.* | No. 11-cv-488-bbc |
| | |
| MICHAEL J. ASTRUE, | Barbara B. Crabb, |
| Commissioner of Social Security, | *Judge.* |
|     *Defendant-Appellee.* | |

**O R D E R**

Helen Henke seeks disability benefits, contending that her psychological and physical problems related to salivary gland surgery render her unable to work. An administrative law judge rejected her application for benefits, concluding that her physical infirmities were not severe and did not preclude her from performing her past work as a housekeeper. Henke's principal argument is that the ALJ erred by rejecting her treating physician's opinion that she had serious physical limitations. This doctor's sweeping conclusions lack support in the medical record, however, and the ALJ sufficiently explained her reasons for rejecting the doctor's reports. Henke also argues that the ALJ made other errors that require a remand, but these purported errors did not prejudice Henke. We therefore affirm.

Henke (then 46 years old) applied in 2008 for Supplemental Security Income contending that psychological problems, including bipolar disorder,[1] as well as residual pain and functional limitations from the removal of her salivary glands, rendered her unable to work. She had previously worked as a front-desk receptionist and housekeeper at a hotel, but quit in June 2006 (her alleged onset date of disability) due to a personal conflict with a co-worker. Henke lives with and cares for her mother, who has serious health problems.

Pain in Henke's salivary glands led her to seek medical help in 2007. Though her salivary glands had caused her intermittent discomfort for the previous decade, the pain worsened in the months preceding her decision to seek treatment. Dr. Roy Dunlap, an otolaryngologist, removed a stone from Henke's left submandibular gland in September 2007. Henke's pain persisted and in November, Dr. Gregory Benson, an oral surgeon, removed that gland. Three months later, Dr. Benson removed Henke's right submandibular gland as well.

As far as the record shows, Henke's salivary gland surgeries went well. At the initial follow-up examination, six days after the removal of her left submandibular gland, Dr. Benson reported that Henke had "minimal difficulties over the past week . . . is tolerating a near-normal diet without difficulty . . . and has minimal need for analgesic medication." And at Henke's second follow-up, 13 days after surgery, Dr. Benson wrote that she had "near complete resolution of her left cervical discomfort . . . [with] no need for analgesic medication." The record does not include similar follow-up notes regarding Henke's right submandibular gland surgery, but Dr. Benson's description of the surgery does not reflect any complications.

Henke visited Dr. Juan Preciado-Riestra, a family practitioner who apparently was her primary-care physician, on several occasions in 2007 and 2008. During Henke's four 2007 appointments, her only physical complaints were her salivary gland condition, a bump on the back of her head, and an injury to her neck and left shoulder that resulted from colliding with a pipe in her home. Dr. Preciado's treatment notes from 2007 do not reflect that Henke had any exertional limitations, range-of-motion problems, or difficulty sitting or standing for extended periods of time. After the four 2007 visits, Dr. Preciado filled out a form entitled "Medical Examination & Capacity" to support Henke's disability

---

[1] Because Henke does not contend that the ALJ's consideration of her psychological condition was erroneous, we do not set forth the details of her psychological diagnosis and treatment. Henke was diagnosed with bipolar disorder, which was in partial remission as of January 2008, and dysthemic disorder with mild symptoms.

application. He limited Henke to lifting and carrying only ten pounds and standing or sitting for a maximum of two hours in an eight-hour day. He also noted that Henke was unable to turn her neck, push, pull, bend, or stoop. Dr. Preciado concluded that, given her limitations, Henke would be able to work "0" hours a day.

Henke also visited Dr. Preciado eight times during 2008. Notes from four of those appointments do not reflect that Henke complained of any relevant physical difficulties. Notes from other appointments, though, indicated that Henke complained of "continued jaw pain post op" at one visit, mild shortness of breath at another, and neck pain at a third appointment. At Henke's final 2008 visit, Dr. Preciado's notes mention a cavalcade of maladies not reported in any of his prior treatment notes or other medical records. Dr. Preciado wrote that Henke suffered from chronic disabling back pain, decreased vision, hip pain, degenerative joint disease, chronic pain syndrome, and post-surgical changes in the cervical spine. Dr. Preciado also determined that Henke had significant range-of-motion limitations in her neck and back. But he reported that Henke was in "no acute distress" and was experiencing only "some residual pain" as a result of her salivary gland surgeries. He also wrote that Henke lived "[p]retty much an independent life taking care of her household, finances, normal grooming etc."

After the final 2008 visit, Dr. Preciado filled out another form in support of Henke's disability application, entitled "Physical Residual Functional Capacity Questionnaire," and reiterated that Henke had profound physical limitations. On this form, Dr. Preciado noted that Henke could sit or stand for only 20 minutes at a time, and needed to take six-minute walking breaks every 20 minutes. Dr. Preciado also determined that Henke could never lift more than 20 pounds, only occasionally could lift ten, and could never look down or look up. Dr. Preciado concluded that Henke would likely miss more than four days of work a month (the highest number of absences reflected on the worksheet) as a result of her limitations.

The ALJ denied Henke's claim for benefits after applying the five-step evaluation process, *see* 20 C.F.R. § 404.1520(a)(4), and rejecting Dr. Preciado's opinions because they lacked support in his own treatment notes and conflicted with other medical evidence in the record. The ALJ concluded that Henke had not worked since her alleged onset date (Step 1); her psychological impairments were severe, but her physical impairments were not (Step 2); her impairments did not meet or equal a listed impairment (Step 3); and that her residual functional capacity allowed her to perform light work with certain limitations, including her past work as a hotel housekeeper (Step 4). Because the ALJ found that Henke could do her past relevant work, she did not proceed to Step 5 of the analysis. *See* 20 C.F.R. § 404.1520(a)(4)(iv). The Appeals Council declined Henke's request to review the ALJ's decision.

The district court found that substantial evidence supported the ALJ's conclusion that Henke could perform light work of the type she had previously performed, and upheld the ALJ's decision. Concluding that Dr. Preciado's opinions lacked support in the medical record, the court agreed with the ALJ's refusal to give these opinions controlling or substantial weight. The court acknowledged, however, that the ALJ made two technical mistakes: limiting Henke to light exertional work at Step 4 after concluding that she had no severe physical impairments at Step 2, and failing to consider the report of the state agency medical consultant, Dr. Pat Chan (who had opined in early 2008 that Henke retained the residual functional capacity to perform medium work). But because these mistakes did not prejudice Henke, the court determined that they were not reversible errors.

Henke argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not give controlling or substantial weight to the findings of her treating physician, Dr. Preciado, that she had significant physical limitations. Henke contends that Dr. Preciado's opinions—that she could not (among other things) lift or carry more than ten pounds, look up or down, or remain sitting or standing for more than 20 minutes at a time—accurately depicted her condition and contests, point-by-point, the ALJ's reasons for rejecting them. In Henke's view, the ALJ ran afoul of the "treating physician rule," which affords controlling weight to a treating physician's opinion that is consistent with the record, by "playing doctor" and substituting her own medical judgment for that of Dr. Preciado. *See* 20 C.F.R. § 404.1527(d)(2) (2009);[2] *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

But the ALJ need not blindly accept a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Though the ALJ must provide some explanation for her decision to discount a treating physician's opinion, our review is deferential: the ALJ's decision must stand as long as she has "minimally articulated" her reasons for rejecting the treating doctor's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ more than minimally articulated her rationale for rejecting Dr. Preciado's opinion that Henke suffered from debilitating physical impairments. The ALJ rightly emphasized that Dr. Preciado's sweeping conclusions lacked support in his own treatment notes. *See Schmidt*, 496 F.3d at 842–43; *Skarbek v. Barnhart*, 390 F.3d 500, 503–04 (7th Cir. 2004); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). For example, the ALJ

---

[2] Where the numbering of the regulation has changed since the ALJ's decision we cite to the version in effect when the ALJ issued her opinion.

rejected Dr. Preciado's conclusion on the 2007 questionnaire that Henke could work "0" hours a week because, in the immediately preceding examination, Henke's lone complaints related to her bipolar medication and an injury to her neck and shoulder resulting from bumping into a pipe in her home. The ALJ likewise discounted Dr. Preciado's 2008 questionnaire because Dr. Preciado based his conclusions in part on limitations—including chronic back pain, hip pain and degenerative joint disease—that were otherwise absent from the medical record, were never treated, and were unsupported by any objective medical evidence. Moreover, the ALJ rejected Dr. Preciado's conclusions by pointing to other medical evidence in the record, including Dr. Benson's notes from the examination conducted two weeks after surgery, confirming that Henke's neck pain was nearly resolved. In sum, the ALJ did not err or improperly "play doctor" by examining the medical record and determining that Dr. Preciado's conclusions were unsupported by his own notes or contradicted by other medical evidence.[3]

Henke also argues that the ALJ erred by determining, at Step 2, that her salivary gland condition was not a severe impairment, and that this mistake justifies a remand. But the ALJ's Step-2 determination regarding Henke's physical condition was immaterial to the ALJ's ultimate decision. Though the ALJ ruled that Henke's *physical* problems were non-severe, she concluded that Henke had severe psychological limitations at Step 2, proceeded to Step 4, and considered all of Henke's impairments—including her salivary gland condition—when making her residual functional capacity determination. Because the ALJ proceeded beyond Step 2, and considered Henke's severe *and* non-severe impairments at Step 4, any purported error in the Step-2 severity determination was harmless. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010).

Moreover, according to Henke, the ALJ's decision at Step 2—finding that she had no severe physical impairments—cannot be reconciled with the ALJ's Step-4 conclusion

---

[3] Henke argues in the alternative that the ALJ should have given Dr. Preciado's opinions "substantial" weight, even if they were not entitled to "controlling" weight, but this argument fares no better. When an ALJ decides not to give a treating doctor's opinion controlling weight, there are several factors relevant to an ALJ's consideration of how much weight to give the opinion. *See* 20 C.F.R. § 404.1527(d) (2009); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, *see* 20 C.F.R. § 404.1527(d)(3) (2009), and its inconsistency with the rest of the record, *see id.* § 404.1527(d)(4). This is enough. *See Elder*, 529 F.3d at 415–16 (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in § 404.1527(d)).

limiting her to "light work." On one hand, the ALJ's Step-2 finding that she had no "severe" physical impairments means that she did not have physical problems that "significantly limit[] [her] . . . ability to do basic work activities." 20 C.F.R. § 404.1520(c). But the ALJ's finding at Step 4 limiting her to "light work," which involves lifting no more than 20 pounds, 20 C.F.R. § 404.1567(b), suggests that she did have physical problems interfering with her ability to work. In Henke's view, the tension between these two decisions renders the opinion illogical and warrants a remand.

But under our deferential standard of review, Henke has not identified any reversible error, especially because she stood to benefit from the apparent inconsistency when the ALJ at Step 4 limited her to light work. It is true that ALJ did not perfectly explain her decision, but a remand is not required for every minor purported error, logical flaw, or inconsistency. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Here, any error was harmless. As discussed above, the case continued on despite the ALJ's finding at Step 2 that Henke's physical impairments were non-severe. Step 4—where the ALJ considered all of Henke's impairments and finally determined her residual functional capacity—was the critical, and reviewable, stage of the proceedings. If anything, the ALJ's decision limiting Henke to light work at Step 4 is *more generous* to Henke than the remainder of the ALJ's analysis appears to support.

For a similar reason, we reject Henke's argument that the ALJ failed to mention the report of the state agency medical consultant, Dr. Chan. Henke correctly notes that the ALJ must consider such reports, *see* 20 C.F.R. § 404.1527(f)(2) (2009), and she believes that a remand is required to allow the ALJ to properly consider Dr. Chan's opinion. But Dr. Chan's report would not have aided Henke's case. *Cf. McKinzey v. Astrue*, 641 F.3d 884, 891–92 (7th Cir. 2011) (ALJ's failure to consider state agency physician's report that *favored the claimant* was still harmless error). Dr. Chan opined that Henke was capable of doing medium work, which does not support a disability finding. And the ALJ ultimately determined that Henke was capable of only light work, a finding more favorable to Henke than Dr. Chan's report.

**AFFIRMED**.