NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2018
Decided August 16, 2018

**Before**

MICHAEL S. KANNE, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 18-1030

| | |
|---|---|
| SCOTT M. EGLY, *Plaintiff-Appellant,* | Appeal from the United States District Court for Northern District of Indiana, Fort Wayne Division. |
| *v.* | No. 1:16cv417 |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, *Defendant-Appellee.* | William C. Lee, *Judge.* |

**O R D E R**

Scott Egly applied for disability insurance benefits and supplemental security income before undergoing open-heart surgery. At that time, Egly suffered from anxiety and depression, and these problems worsened in the immediate aftermath of his surgery. He also experienced post-operative physical complications. An administrative law judge concluded that Egly, although suffering from severe impairments, was not disabled because he could perform several sedentary jobs subject to certain restrictions. The district court affirmed. Because the ALJ's opinion is supported by substantial evidence, we too affirm.

## I

Egly first sought disability benefits in March 2012, just before undergoing open-heart surgery. The previous month he had gone to the emergency room complaining of chest pain and was diagnosed with atrial fibrillation. An echocardiogram revealed dilation of his aorta, and a CT scan showed an aortic aneurysm. On March 30, 2012, a surgeon replaced Egly's aortic valve and ascending aortic arch, closed a hole in his heart, and conducted a procedure intended to resolve the atrial fibrillation. Egly continued to experience chest pain and complications after surgery. He visited the emergency room or an urgent-care facility five more times between April and June 2012 complaining of chest pain, tingling in his arm, a dry cough, and other conditions.

As for his mental health, Egly had trouble rebounding from the cardiac surgery and reported that his preexisting depression and anxiety had worsened. Accordingly, in June 2012, in connection with Egly's application for benefits, clinical psychologist Neil Shamberg performed a consultative exam for the state disability-determination agency. Dr. Shamberg diagnosed major depressive disorder, anxiety, and low average intelligence, the combined effects of which impaired Egly's concentration, memory, understanding, and occupational functioning. Although Dr. Shamberg was encouraged by Egly's desire to attend counseling, he found that Egly was a "severely depressed man" and opined that "even with psychiatric help and counseling, the prognosis for rapid improvement here must be very guarded."

In July 2012, a state-agency reviewing psychologist, Dr. Kristen Haskins, offered a contrary prognosis. Dr. Haskins opined that Dr. Shamberg's conclusions about Egly's limitations were not supported by the diagnostic criteria he described, and, more specifically, that Egly's depression was likely an "adjustment reaction to his medical condition," rather than a long-term impairment. Another psychologist, Dr. Donna Unversaw, reviewed Egly's medical file and agreed with Dr. Haskins's assessment.

As for Egly's physical recovery from his surgery, he was examined in August 2012 by cardiologist Farrukh Khan, who determined that he was "okay to go back to work." But despite Dr. Khan's medical clearance to return to work, Egly continued to report challenges throughout 2012, including symptoms associated with seizures or strokes. For example, he went to the emergency room in August, complaining of fatigue, shortness of breath, atrial fibrillation, and a headache. Approximately one month later he returned to the emergency room complaining of incoordination, weakness on his left side, and headaches. Egly visited the hospital once again the following week while experiencing atrial fibrillation and symptoms of either a seizure

or a stroke. An electroencephalogram was abnormal, and an MRI showed possible evidence of "partial seizures" or "chronic micro bleeds." An electrocardiogram revealed continuing heart problems in his left ventricle and left atrium. Egly's frequent visits to the emergency room continued from September 2012 to February 2013, during which he typically reported symptoms similar to those of his prior visits.

In January 2013, Egly sought treatment for his depression and anxiety from his primary-care physician, Dr. Shawn Kidder, who prescribed Abilify to supplement Egly's already-existing Zoloft prescription and suggested Egly undergo counseling. The following month Egly began family counseling with Dr. Judith Williams, a clinical psychologist. Dr. Williams diagnosed him as having an adjustment disorder with mixed anxiety and depression, and noted that following his heart surgery, Egly struggled with marital problems and feelings of helplessness. During each of his eight visits, however, Dr. Williams found Egly generally in a good mood. And for his part, Egly repeatedly told Dr. Williams he was "doing well" or "doing better." Egly stopped attending counseling in June 2013 because his insurance would not cover any more visits that year. Although periodically describing subsequent problems with depression, Egly did not seek counseling at any point after June 2013.

An ALJ conducted a hearing in July 2013, and found Egly was not disabled. The ALJ concluded that, although Egly had certain severe physical impairments, his mental impairments, seizures, and strokes were not severe, and he could perform certain sedentary work with additional limitations. The Appeals Council vacated the ALJ's decision and remanded for reconsideration of Egly's residual functional capacity. The Appeals Council pointed out that the ALJ had not discussed Dr. Shamberg's opinion or analyzed the differences between that opinion and those of the reviewing psychologists.

While awaiting a second hearing, Egly continued to complain of physical problems, but his test results were generally normal. He tested positive for mild neuropathy in October 2013, and his atrial fibrillation continued through January 2015. Despite these issues, though, Egly was examined in January 2015 by Dr. Khan, who opined that Egly was "stable from a cardiac standpoint."

At his second hearing before the same ALJ in February 2015, Egly testified that he had recently felt he needed different depression medication because he was becoming agitated more often and inclined on some days to just stay in bed. Egly added that he drove at least once every day and often passed the time with a friend. He also stated that his heart went into fibrillation for three to five minutes about five to ten days per month.

A vocational expert also testified and explained that a person with Egly's physical and mental limitations could perform certain simple, low-stress sedentary jobs subject to particular restrictions. For example, the vocational expert testified that a person with Egly's limitations could work as an addresser, order clerk, or document preparer. In response to an inquiry from the ALJ, the vocational expert added that even a person with certain mental limitations (someone limited to simple, repetitive tasks; superficial interactions with coworkers and the public; low-stress work; occasional decisionmaking and occasional changes in the workplace) could still perform particular jobs.

Following this second hearing, the ALJ again applied the familiar five-step disability test and found Egly was not disabled. The ALJ renewed his finding that Egly had no severe mental impairment for a twelve-month period. In reaching that finding, the ALJ rejected both Dr. Shamberg's opinion about Egly's severe impairments and the opinions of the reviewing psychologists. In particular, the ALJ concluded that Dr. Shamberg's June 2012 opinion was not persuasive in light of later evidence from 2013 and beyond, such as Dr. Williams's counseling reports from 2013 that showed Egly was doing better and treatment notes from the Fort Wayne Neurological Center indicating that Egly's psychiatric system was functioning normally in 2013.

The ALJ further determined that Egly's physical impairments, including cardiac problems, obesity, arthritis, headaches, and reported seizures, necessitated a finding that Egly could do only limited sedentary work. To accommodate the reported seizures, the ALJ found that Egly should avoid working in proximity to exposed and open heights or open and dangerous machinery. But even with those restrictions—and even considering additional restrictions to accommodate Egly's alleged mental limitations—the ALJ concluded jobs existed in the economy that Egly could perform. The Appeals Council denied review, and the district court affirmed the ALJ's ruling.

**II**

Egly's primary argument on appeal is that the ALJ improperly rejected the opinion of Dr. Shamberg, the consultative psychological examiner who observed in June 2012 that he suffered from mental limitations. Egly suggests that the ALJ, in rejecting this opinion, "played doctor" by overstating the significance of statements he made during counseling appointments and other doctors' visits.

On appeal we ask whether the ALJ's decision to reject Dr. Shamberg's opinion was supported by substantial evidence. 42 U.S.C. § 405(g). As the Supreme Court

explained in *Richardson v. Perales*, 402 U.S. 389 (1971), this standard requires more than "a mere scintilla" of proof and instead "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 401. In reviewing the administrative record, our role is not to reweigh the evidence or substitute our judgment for that of the ALJ. See *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Measured against these standards, we find no error in the ALJ's decision not to afford dispositive weight to Dr. Shamberg's opinion. Our case law makes clear that "[a]s a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). Dr. Shamberg's opinion was not persuasive, the ALJ explained, because—as the state-agency psychological reviewers also noted—it pertained only to a limited period of time after Egly's open-heart surgery. In fact, Dr. Shamberg's 2012 opinion preceded all of Egly's subsequent mental-health treatment. Egly attended his first counseling session in February 2013, and soon began to tell his counselor that he was "doing better" before he stopped attending in June 2013. On this record, it was reasonable for the ALJ to conclude that Egly's mental health had improved in the time between his meeting with Dr. Shamberg in June 2012 and his hearing before the ALJ in February 2015. The record contains no evidence of attempts by Egly to obtain mental-health treatment after June 2013.

Egly contends that the ALJ overemphasized his cessation of counseling, arguing that he stopped attending because of a lack of insurance rather than any improvement in his condition. In some circumstances, it would be error to rely on a claimant's failure to obtain treatment when that situation is due to a lack of insurance. See *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). But here the ALJ made no such error. Foremost, the ALJ assigned no fault to Egly for his insurance coverage expiring. Rather, the ALJ primarily relied on evidence showing that Egly's mental health improved after 2012, as well as the absence of evidence (from Egly or anyone else) showing that Egly's mental-health impairments persisted to the severe degree Dr. Shamberg had reported in 2012.

Even if the ALJ had erred by rejecting the mental limits described by Dr. Shamberg, any error would be harmless. See *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016) (explaining that harmless-error review applies in Social Security cases). Though the ALJ did not explicitly incorporate any mental limits into his findings about Egly's residual functional capacity, he explained that, according to the vocational expert, jobs still would be available to a person with mental impairments that limited

them to only simple tasks, with superficial interaction with others, low stress, and a goal-oriented pace. In this way, the ALJ in effect largely incorporated Dr. Shamberg's conclusions about Egly's limitations. On this record, Egly cannot show that accepting Dr. Shamberg's opinion would have resulted in a different finding regarding his ability to work. See *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Egly next argues that the ALJ made too much of the lack of corroborating medical evidence when minimizing his physical conditions, including his reported seizures, reported strokes, and cardiac problems. It is true that an absence of medical evidence is not by itself sufficient to discredit allegations of disabling limitations. See *Thomas v. Colvin*, 745 F.3d 802, 806–07 (7th Cir. 2014). But even if the ALJ incorrectly assumed that Egly had no problems with seizures or strokes, he did not incorporate that assumption into his decision. Instead, out of an abundance of caution, the ALJ *included* limits related to seizures and strokes into Egly's residual functional capacity. Similarly, the ALJ restricted Egly to sedentary work to accommodate his cardiac conditions, which by all accounts have stabilized. Egly has not pointed to any additional functional limitations that the ALJ should have included.

Egly also argues in a perfunctory manner that the ALJ improperly relied on the scope of his daily activities (for example, attending appointments or his daughter's softball games) to conclude that he is not disabled. The record does not support this view, as the ALJ did not "equat[e] activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (distinguishing between an ALJ's proper consideration of a claimant's daily activities to assess his or her credibility and the improper practice of equating daily activities of living with an ability to work). Instead, the ALJ properly considered Egly's activities in concluding that his testimony was exaggerated. See *id*. The ALJ reasonably found that Egly's reports of visiting with friends, shopping, and completing household tasks were inconsistent with his reported severe difficulties in mental functioning.

Finally, Egly submits that his many visits to the emergency room suggest either an additional degree of physical impairment or necessary functional limitation. This argument is not developed in any detail. Regardless, the record shows that the ALJ did discuss Egly's visits to the emergency room, including by recognizing that these visits tapered off as his cardiac health improved. Egly's most recent emergency-room visits (for a head injury, pneumonia, and a puncture wound in his leg) were unrelated to the physical impairments at issue in this case. There is no evidence that Egly continues to

seek the same level of emergency aid for cardiovascular problems as he did immediately following his heart surgery.

For these reasons, we AFFIRM the district court's judgment affirming the denial of benefits.