NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2018
Decided August 20, 2018

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 17-3562

| | |
|---|---|
| DONNA J. WEAVER, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | |
| | No. 1:16-cv-00268-WCL-SLC |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, *Defendant-Appellee.* | William C. Lee, *Judge.* |

## O R D E R

Donna Weaver, a 67-year-old diabetic, appeals the district court's judgment upholding the denial of her application for disability-insurance benefits. An administrative law judge found that, despite her impairments, she could work at all exertional levels. Weaver challenges the adequacy of the ALJ's assessment of her residual functional capacity and his finding that she was not entirely credible. On this record, the ALJ committed only harmless error by overlooking the medical opinion of a nontreating physician and did not make a patently wrong credibility finding. We therefore affirm the judgment.

Weaver applied in 2012 for disability-insurance benefits based on her diabetes, right-thumb amputation, nerve damage in her stomach (gastroparesis), thyroid problems, and kidney problems—ailments that, she said, rendered her unable to work as of the summer of 2011. Weaver, a high-school graduate, spent most of her career as a machine operator at a paper company (1980–2006) and later worked as a retail stocker (2007–2008), an auditor clerk (2008–2009), a machine operator (2009–2011), and most recently as a part-time cashier at a dollar store (2013–2014).

Weaver's relevant medical records date back to 2006, when an endocrinologist, Dr. J. Matthew Neal, examined her type 1 diabetes and documented her trouble managing her hypoglycemic episodes. At spring appointments, Dr. Neal diagnosed her with swelling in her ankle and noted that she had a "severe" hypoglycemic episode at work. He opined that she had a "moderate" risk of having another episode and that she should avoid "heavy or hazardous machinery." But he concluded that "she appeared well and fit for work." Two months later, noting her continued poor control of her diabetes, Dr. Neal observed that "different insulin regimes" that she tried did "not appear to help." About four months after that, Dr. Neal documented her "quite erratic" glucose levels and recommended that she eat more regularly. Weaver then lost her job at the paper company and, lacking health insurance, did not see Dr. Neal for 16 months.

At subsequent appointments in 2008 and 2009, Dr. Neal observed that Weaver continued to struggle with monitoring and managing her blood sugar. At an appointment in the winter of 2008, he advised her not to drive without first checking her blood sugar. About a year later, Dr. Neal found that her "glucose readings are quite poor" and that "she does have several complications of diabetes including possible early chronic kidney disease … and neuropathy." Two months later, he determined that her control over her diabetes continued "to be erratic, probably complicated by her diet." (She ate only one meal per day and said that she had "some aversion to food and some nausea.") According to Dr. Neal, Weaver's "symptoms certainly sound like gastroparesis" (impaired stomach muscles controlling food digestion).

After a 13-month period without insurance and no medical visits, Weaver's health deteriorated in mid-2010, and she was treated for kidney failure and chronic kidney disease. During this time period, she also experienced recurring sinus headaches and went to the emergency room for lightheadedness, reporting that she was not taking her blood-pressure medication because she was uninsured.

Over the next two years, Weaver lost weight, continued to have trouble controlling her diabetes, and visited an orthopedic surgeon. At appointments in September 2010 and January 2011, her primary-care physician, Dr. Thomas Stewart, noted that she had lost weight because of irregular eating and was not effectively managing her blood sugar. Six months later, Dr. Stewart recorded her complaints of sinus headaches and noted that she continued to lose weight. At her appointment with the surgeon, Weaver was diagnosed with carpal tunnel syndrome in her right hand and two left-hand trigger fingers and underwent trigger-finger-release surgery.

In July 2012, a state-agency consultative examiner found that Weaver had no musculoskeletal or neurological abnormalities, opined that her diabetes and gastroparesis problems could be minimized with more effective dieting, and concluded that she "should avoid use of hazardous power equipment." Weaver told the doctor that she could walk 12 blocks, lift up to 50 pounds, and stand for 8 to 12 hours per day. About a week later, another state examiner opined that Weaver had "no severe impairments" that would prevent her from working.

Dr. Stewart documented Weaver's problems with swelling and managing her blood sugar in 2013 and 2014, and she suffered two hypoglycemic episodes that caused her to go to the emergency room in 2014. At three appointments between May 2013 and February 2014, Dr. Stewart recorded swelling in her hands and soft tissue. He also noted her complaints of having "on and off low blood sugars" and temporarily losing consciousness as a result of low blood sugar. Several months later, Weaver's son took her to the emergency room during a hypoglycemic episode, and five months after that, Weaver had another episode while on the road, causing her to drive, with her grandson, into a ditch, crash her car, and return to the emergency room. Upon discharge, the E.R. doctor instructed: "Limited activity, Limited work, No heavy lifting." The next day Dr. Stewart advised her to stop driving, but she rejected his suggestion and said that she would "check [her] blood sugar just before she drives."

At a hearing in the fall of 2014 (after the Appeals Council had vacated the ALJ's first decision denying Weaver benefits and remanded the case), Weaver testified that instances of her blood sugar significantly dropping had increased to three to four times per month and that she checked her blood sugar more often—about six to ten times per day instead of once per day as she had previously done. She also said that she had continued to lose weight as a result of regularly not feeling hungry and that at her part-time retail job, she had "dizzying spells" once or twice per three days of work and "maybe one" unscheduled break over the same period because of her blood sugar

dropping. (She said that her boss let her take breaks as needed.) She also had to leave work "a couple of times" because of hypoglycemic episodes and sinus headaches. The ALJ asked a vocational expert whether a person who could not work at unprotected heights or operate hazardous machinery could perform any of Weaver's past jobs. The expert replied that this person could work as an auditor clerk or retail stocker.

The ALJ applied the five-step analysis in 20 C.F.R. § 404.1520(a)(4), and found Weaver not disabled. The ALJ determined that she had not engaged in substantial gainful activity since the alleged onset date of July 1, 2011 (step one); that her diabetes mellitus was a severe impairment (step two); that this impairment did not equal a listed impairment (step three); that she had the residual functional capacity to perform a full range of work at all exertional levels, save for work at unprotected heights or around hazardous moving machinery; and that she could perform her past jobs as an auditor clerk and a retail stocker (step four).

In determining Weaver's residual functional capacity, the ALJ found her testimony about the severity of her impairments "not entirely credible." The ALJ concluded that the evidence suggested that Weaver was capable of working and pointed out that she left her last full-time job (the second machine-operator position) because her factory shut down, not because of her health, and that her symptoms were present when she last worked full time. The ALJ added that she still had "essentially a fulltime workload" between her three days of part-time cashiering at the dollar store (she worked more than 30 hours per week several times) and her care for her grandchildren two to three days per week. Further, the ALJ concluded, the medical record showed that her diabetes did not "more than minimally affect [her] ability to work" and that her hypoglycemic episodes did not occur frequently enough to prevent her from working. Finally, the ALJ observed that Weaver lacked corroboration that her employer allowed her to take unscheduled breaks, which other employers might not.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). The district court upheld the ALJ's decision.

On appeal Weaver argues that the ALJ violated 20 C.F.R. § 404.1527(c) by failing to evaluate the E.R. doctor's opinion that she should be restricted to "Limited activity, Limited work, No heavy lifting." She also emphasizes that the ALJ provided few work

restrictions for her diabetes, including the hypoglycemic episodes, and failed to acknowledge that Weaver had the more-severe "brittle" form of diabetes.

Weaver is correct that the ALJ violated § 404.1527(c) by not considering the E.R. doctor's opinion, but this error was harmless because we can conclude "with great confidence" that the ALJ would reach the same decision on remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Even if the ALJ had imposed the E.R. doctor's recommended restrictions, they would not prevent Weaver from returning to her past job as an auditor clerk, a sedentary position requiring the least amount of exertion under the regulations and lifting less than 10 pounds at a time. *See* U.S. DEPARTMENT OF LABOR, I DICTIONARY OF OCCUPATIONAL TITLES 210.382-010 (4th ed. 1991); 20 C.F.R. § 404.1567(a). Moreover, the E.R. doctor did not have "an ongoing treatment relationship" with Weaver and therefore did not qualify as her treating physician. 20 C.F.R. § 404.1527(a)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). So his opinion "does not carry significant weight" in comparison to the opinion of Weaver's treating physician, Dr. Stewart, who did not suggest the same limitations but whose opinion the ALJ considered. *McKinzey*, 641 F.3d at 892. Under circumstances in which an ALJ considered a treating physician's medical opinion but overlooked that of a non-treating physician on the same subject, we have found the error to be harmless. *See id.* at 891–92. "There is not the slightest uncertainty as to the outcome of a proceeding" on remand because, as noted, Weaver could have "Limited activity, Limited work, No heavy lifting" and still work as an auditor clerk, meaning that these limitations would not affect the ALJ's disability determination. *N. L. R. B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

Weaver further argues that the ALJ erred by not imposing any restrictions for her diabetic neuropathy, her "brittle" strain of type 1 diabetes, or her problems with her feet, hands, kidneys, and depression. But Weaver having been diagnosed with these impairments does not mean they imposed particular restrictions on her ability to work. *See Schmidt v. Barnhart*, 395 F.3d 737, 745–46 (7th Cir. 2005). It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work. *See id.*; *see also* 20 C.F.R. § 404.1512(a).

Weaver also contends, more persuasively, that the ALJ did not address the "interrelation" between her diabetes and gastroparesis in evaluating her residual functional capacity. The ALJ said that the record does not contain evidence that gastroparesis caused Weaver not to eat regularly. Dr. Neal opined, however, that

Weaver's control of her diabetes was "erratic, probably complicated by her diet" and noted that Weaver's gastroparesis caused her to have "some aversion to food and some nausea" and to "normally eat only one meal per day." But the ALJ's error here was also harmless because the ALJ adopted all of the functional limitations suggested by Dr. Neal and therefore implicitly weighed the combined effects of these impairments. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Weaver does not identify any evidence regarding the combined effects of her gastroparesis and diabetes that would justify additional limitations in the RFC assessment.

Weaver next challenges the ALJ's adverse-credibility finding. First, she contends that because of her long and continuous work history, the ALJ should have found her credible. But a good work history "is still just one factor among many, and it is not dispositive." *Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017) (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 404.1529(c)(3).

Weaver also contends that the ALJ wrongly inferred from her part-time employment and care for her grandchildren that she was not credible in claiming an inability to work full time. The ALJ indeed made this impermissible inference. This court has instructed ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment, *see Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017), or care for a family member, *see Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014). In fact, attempts to work may enhance a claimant's credibility. *See Pierce v. Colvin*, 739 F.3d 1046, 1050–51 (7th Cir. 2014).

Nevertheless, the ALJ's credibility determination is not "patently wrong" because it is otherwise informed by "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (internal quotation marks and citation omitted). The ALJ defensibly discredited Weaver for understating the amount of time she worked at her part-time job; driving, even with her grandchild, despite her reported fear of sudden hypoglycemic episodes; and not complying with her doctors' orders to: (1) use the provided blood-sugar kit; and (2) change her dietary habits. This non-compliance allowed the inference that the severity of her symptoms would be diminished if she followed her doctors' advice. *See Dixon v. Massanari*, 270 F.3d 1171, 1179 (7th Cir. 2001) (ALJ reasonably determined that diabetic claimant's testimony was not credible because of noncompliance with her doctor's dietary recommendations).

AFFIRMED