## In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2261

REBECCA E. PEPPER,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN,* Acting
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:11-cv-01007-JES—**James E. Shadid,** *Chief Judge.*

ARGUED JANUARY 16, 2013—DECIDED APRIL 4, 2013

Before BAUER and HAMILTON, *Circuit Judges*, and
MILLER, *District Judge*.**

---

* Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate
Procedure, we have substituted Carolyn W. Colvin for
Michael J. Astrue as the named defendant-appellee.

** The Honorable Robert L. Miller, Jr., District Judge of the
United States District Court for the Northern District of
Indiana, sitting by designation.

BAUER, *Circuit Judge*. Rebecca E. Pepper suffers from numerous physical and mental impairments that affect her ability to function. In 2008, she applied for disability benefits, but the Administrative Law Judge (ALJ) denied her claim. Now, after unsuccessfully seeking relief from the district court, Pepper turns to us contending that the ALJ's ruling is both substantively and procedurally flawed. Specifically, Pepper argues: first, that the ALJ made numerous errors when addressing Pepper's residual function capacity (RFC), and second, that the ALJ's credibility determination was inadequately supported and patently wrong. We believe that substantial evidence supports the ALJ's denial of benefits and affirm.

## I. BACKGROUND

In September 2008, Pepper, then 54 years old, applied for Supplemental Security Disability Insurance Benefits with the Social Security Administration (SSA), alleging that she became unable to work in November 1998 as a result of numerous physical and mental impairments. (The alleged onset date was later amended to October 18, 2002, the date Pepper last worked.) The critical inquiry is whether Pepper became disabled at any time prior to December 31, 2007, the date Pepper was last insured. *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008). The SSA denied Pepper's claim but granted her a hearing with an ALJ, which was held on October 26, 2009.

## A. Medical Records

The extensive medical records in this case demonstrate that Pepper sought treatment for numerous health concerns over the years. At various times, Pepper has been assessed as having the following ongoing ailments: neck pain and limited range of motion in her neck, degenerative disc disease in her spine, left knee problems, migraine headaches, problems with her vision, diabetes, asthma, mitral valve prolapse, sciatica, dyslipidemia, hyperglycemia, hypertension, allergic rhinitis, obesity, plantar fasciitis in her left heel, caregiver stress, and depression. We confine our discussion of Pepper's medical records to the information most relevant to the ALJ's ultimate determination and this appeal.

### 1. Physical Impairments

#### a. Knee, Back, and Neck Problems

Pepper said that her left knee pain began in 1998 when she was going up and down a ladder. She took anti-inflammatory medicine but claimed it did not relieve the discomfort. A 2000 magnetic resonance imaging scan (MRI) was negative except for small effusion at the knee. In January 2003, Dr. Christopher Kafka, Pepper's cousin, noted that Pepper had a chronic problem with her left knee and decreased range of motion, which he estimated to be 10-25 degrees and opined that Pepper walked with a limp and had back pain as a result. An examination in December 2003 revealed the knee could only flex 20 degrees and made a creaking sound

with movement, but there was no local edema (excess fluid).

Pepper began seeing Dr. Xiaolu Li, a family practitioner, in January 2004. She noted that Pepper could not bend her left knee very well and had back pain on her left side that radiated to her left knee. Pepper complained of a new knee pain in July 2005. An x-ray that month was negative. In August 2005, Pepper saw Dr. Susan Goodner, a VA staff physician, who noted that Pepper "would not let her move [Pepper's] left knee" and she "could not force it into flexion."

Pepper had an appointment with Dr. Janelle Regier, a VA rheumatology fellow, in October 2005. Pepper said the knee pain had gone away but that she could not flex her knee past 15 degrees. Dr. Regier noted that Pepper "walks with a limp and walks on the lateral side of the right foot." Pepper could stand with both feet flat on the floor without pain, "walk heel-toe," and stand on her heels. She had difficulty standing on her tiptoes. Dr. Rebecca Tuetken, a VA staff physician, agreed with Dr. Regier's assessment. Also in October 2005, Dr. Shaun Christenson, a VA resident, noted that Pepper favored her left leg when walking "due to [an] old knee injury." Dr. James Putman, a VA staff physician, noted in April 2006 that Pepper had arthritis in her knees and back.

In October 2007, Pepper was able to perform a "Get-up and Go Test."[1] That month, Dr. Mike Hackmann, a VA

---

[1] The patient is asked to perform a series of maneuvers,

(continued...)

staff physician, noted that Pepper's exercise tolerance was "okay." A progress note from December 2007 states, "[Pepper] was instructed to exercise aerobically for 20-30 minutes three times weekly as directed by [her] physician" and "to increase physical activity."

Pepper told her doctors that she began experiencing left neck pain in 1994 when she was answering phones while working as a secretary. In January 2003, Dr. Kafka noted that Pepper could only rotate her neck 5 degrees to the left and 75 degrees to the right. He said Pepper's flexion was within normal limits. Examinations in February 2004 and January 2005 did not reveal any abnormalities.

Pepper said in July 2005 that she "has to sit a certain wa[y] and turn her head to see properly." Neck x-rays that month revealed degenerative disc disease at C5-6—disc space narrowing and anterior osteophyte formation. In August 2005, Pepper saw Dr. Goodner who wrote, "Testing ROM of neck was nearly impossible. Either the patient could not understand my directions or she simply could not make her neck move as I instructed her to do." Dr. Goodner further stated, "[T]his almost strikes me as deliberate, but cannot rule out early movement disorder or rheumatologic disorder[.]"

---

[1] (...continued)
including sitting, standing up, and walking around. The purpose of the test is to assess a person's mobility and evaluate the individual's risk of falling. *See* "Get Up and Go Test," *American Academy of Neurology*, http://www.aan.com/practice/guideline/uploads/273.pdf (last visited Apr. 1, 2013).

In October 2005, Dr. Regier noted that Pepper could not rotate her neck past 35 degrees even though she no longer had pain. Pepper did not know why she could not move her neck despite the absence of pain. Dr. Regier could not explain Pepper's lack of range of motion and said that the degenerative disc disease did not explain Pepper's symptoms. That month, Pepper told Dr. Deema Fattal, a VA staff physician, that she "hears cracking/noises" in her neck and that, in 1998, her neck issues were exasperated when carrying a heavy box with a coworker. Further examinations by Dr. Christenson revealed 5/5 strength in Pepper's upper and lower extremities, normal reflexes, and normal sensation despite findings that (1) Pepper had "some" cervical osteoarthritis; (2) her right sternocleidomastoid muscle (large muscle on the side of her neck) was "hypertrophied"; (3) she had dystonic posturing (her right shoulder was higher than her left); and (4) she had a hint of left laterocollis (tilting of her head). Pepper could only move her neck in a "jerky/nonstraight" path. In October 2005, Dr. Fattal and Dr. Christenson recommended Pepper get Botox injections for her neck problems.

An MRI of Pepper's spine in November 2005 revealed mild degenerative disease throughout Pepper's cervical spine with foraminal narrowing at C5-6. Pepper saw Dr. Ergun Uc, a VA staff neurologist, the day after her MRI. Pepper had a limited range of motion in her neck that she claimed impeded her driving and led to other compensatory measures. Pepper denied any sig-

nificant pain. Dr. Uc repeated Dr. Christenson's findings regarding Pepper's head tilt, ability to rotate her head, and elevated right shoulder, and noted the July 2005 x-ray findings. Dr. Uc also stated that an electromyogram (EMG) and nerve study of Pepper's cervical paraspinal muscles was normal, but that it was not clear how much of Pepper's posture abnormalities were due to the degenerative joint disease. Dr. Uc thought Botox injections might improve Pepper's neck range of motion.

In December 2005, Dr. Uc contacted Pepper with her MRI results and suggested that she try Botox. Pepper said she was not interested in the Botox injections. In November 2006, Dr. Putman wrote that Pepper could do activities of daily living "okay." In December 2007, Dr. Hackmann noted that Pepper had an "episode" in November 2007 of sharp pains along the left side of her neck and back but that Pepper was "feeling much better." Dr. Hackmann said this episode was most likely the result of a muscle strain and recommended Pepper apply heat and perform range of motion exercises to relieve discomfort.

### b. Vision Problems

Pepper saw Dr. Jill Brody, an ophthalmologist, approximately every six months from 1997 to November 2007. Dr. Brody diagnosed Pepper with numerous, longstanding vision issues, including congenital esotropia (crossed eyes), nystagmus (rapid eye movements), double vision, vertigo, suspected glaucoma, the effects

of migraine headaches, and "mild" cataracts. Aside from cataracts, which Dr. Brody discovered in 2004, Pepper had most of these problems at birth or several years before she stopped working in 2002.

During appointments in 1999, 2003, and 2005, Pepper told Dr. Brody that she periodically sees yellow spots. In September 1999 and May 2006, Pepper complained to Dr. Brody of difficulty reading at times due to blurriness. Pepper said "small print was more difficult to see" in November 2007.

At various appointments from 1998 to 2008, Pepper had visual acuity of 20/20 to 20/30 in each eye with glasses. (20/20 is normal vision). In 2008, Dr. Brody opined that Pepper could read fine print occasionally, ambulate safely, avoid common hazards in the workplace, drive safely, and perform activities that require good distant, detailed vision. She described the prognosis for Pepper's right and left eye as "fair." Dr. Brody also concluded that Pepper has no depth perception, has poor hand/eye coordination, and gets headaches from her nystagmus.

### c. Respiratory Ailments

In December 2003, Rod Hyde, a VA physician assistant, noted Pepper had asthma that was "stable on inhalers" and medication. In May 2005, Dr. Li noted that Pepper's asthma was "worsening" and that Pepper was having more coughing, wheezing, and shortness of breath. In

October 2005, Dr. Goodner described Pepper's allergies as being "year round but worse in spring, summer, and fall." Dr. Putman noted Pepper's asthma and allergies in April 2006. At that time, Pepper said her breathing was stable, she got "good relief" from her inhalers, and she did not have any cough. Dr. Putman noted the same observations at another appointment in November 2006. In May 2007, Dr. Hackmann described Pepper's asthma as "well controlled" on medication. In September 2007, Pepper completed a pulmonary function test, which resulted in a "normal ventilator function" finding.

### d. Migraine Headaches

The medical records demonstrate complaints of migraine headaches to Dr. Brody as early as January 1999. In January 2003, Dr. Kafka noted that Pepper had migraines. Hyde noted that Pepper's migraines were "stable" on medication in December 2003. Dr. Li wrote that Pepper had been having migraines in March 2004, but they were "better" in April 2004. Pepper told Hyde in December 2004 that her migraines were better controlled and that she had no concerns regarding them. Dr. Li noted Pepper had headaches "once every 3-4 month[s]" in July 2005. In August 2005, Dr. Goodner said Pepper has migraines several times monthly but that she had gone several months without a headache and gets "good relief" from medication. In October 2005, Dr. Fattal noted that Pepper has four migraines per year. In April 2006, and again in November 2006, Dr. Putman

made a note of Pepper's past history of migraines but did not discuss them further.

### e. Obesity

In February 2000, Pepper was 5'1" and weighed 158 pounds. Her body mass index (BMI) was 29.9, which is considered "overweight" but not "obese." *See* S.S.R. 02-01p, 2002 SSR LEXIS 1, at *4-6*. After Pepper stopped working in 2002, her weight fluctuated. In January 2003, Dr. Kafka said he could not evaluate Pepper's lumbar spine because she was overweight. In December 2003, Hyde said Pepper's weight had increased approximately 100 pounds since 1998 and she was now morbidly obese. In February 2004, Pepper weighed 192 pounds and had a BMI of 36.4. In December 2004, Hyde said Pepper's obesity was "worsening," Pepper was "morbidly obese," and Pepper's obesity was adding to her "lipid/sugar and back problems."

In December 2005, Pepper weighed 183 pounds and had a 35.1 BMI. In November 2006, she weighed 174 pounds, with a BMI of 33.0. In May 2007, Pepper was down to 169.4 pounds, with a 32.1 BMI. Pepper was told in October 2007 that maintaining a healthy weight would help control some of her ailments. On December 6, 2007, shortly before Pepper's date lasted insured, Pepper weighed 159.2 pounds and had a BMI of 30.1. This was approximately the same weight Pepper weighed when she was working in 2002.

### 2. Mental Impairments

The medical records demonstrate Pepper has complained of mental impairments over the years. In January 2003, Dr. Kafka diagnosed Pepper with depression and anxiety. He noted that Pepper had been stressed since 1994 because she felt she might lose her job. In December 2003, Hyde noted Pepper's depression but wrote that it was "stable on Paxil." He described her as "alert, oriented[,] and cheerful" but wrote that she had a "somewhat anxious manner." In January 2004, Pepper complained of fatigue, poor memory, poor concentration, irritability, and being tearful; Dr. Li detected no abnormalities of insight, judgment, orientation, memory, or mood at that time. Dr. Li similarly detected no abnormalities in March, April, July, and November 2004, though Pepper again complained of depression and fatigue at the November 2004 examination. A depression screening was positive in December 2004, but Hyde said Pepper's depression was "stable" and wrote that it was better controlled and that Pepper had no concerns.

In January, May, and July 2005, Dr. Li described Pepper as alert and intact and detected no abnormalities in her judgment or insight. Pepper said her fatigue was better in July 2005. In August 2005, Dr. Goodner noted that Pepper had "caregiver stress" after Pepper described "feeling blue, like her life is over" because it was hard to find someone to watch over her disabled husband. Dr. Goodner also wrote that Pepper seemed "sad." However, Pepper declined medication and counseling because

she was working with a naturopath[2] at home. About two weeks later, Pepper told Lisa Stritesky, a social worker, that she could not work because her husband needs supervision and that she would "feel relieved" once they had moved.

In October 2005, Pepper told Dr. Christenson her mood  was "fine." In December 2005, Pepper told Dr. Li that she was under a lot of stress taking care of her parents; however, her energy was better, and she was sleeping better. At that appointment, Dr. Li told Pepper about the relationship between Pepper's hormonal imbalance and her body physiology and function, and checked to see if Pepper was using her hormone cream correctly. (Dr. Li discussed this with Pepper on numerous occasions between 2004 and 2007). In April 2006, Dr. Putman noted that Pepper displayed appropriate insight, judgment, mood, and affect; Dr. Li made similar observations in November 2006, although Dr. Putman noted depression as an active problem during another November 2006 examination.

In May 2007, a depression screening was negative. In October 2007, a licensed practical nurse said Pepper did not have an altered cognitive status. At a separate appointment in October 2007, Dr. Li did not detect any

---

[2] Naturopathy is a type of alternative medicine that focuses on the restoration of health through vitalism or the natural self-healing processes. *See* "Naturopathy," *Wikipedia*, http://en.wikipedia.org/wiki/Naturopathy (last visited Apr. 1, 2013).

abnormalities with Pepper's memory, mood, affect, insight, or judgment. In January 2009, Howard Tin, a psychologist, reviewed Pepper's medical information from before her last insured date. He concluded that there was "[n]o psychiatric treatment and no mental medical treatment" before then and "there is insufficient medical information to establish any kind of mentally disabeling [sic] impairment before the DLI."

### B. October 26, 2009 Hearing

At the hearing with the ALJ, Pepper testified that she is married without children and the primary caregiver to her disabled husband, who suffers from schizophrenia. She is 5'1" and weighs approximately 170 pounds. She is a high school graduate and received secretarial training at a junior college. She is right-handed and has a driver's license. The only restriction on her license is that she must wear glasses. Pepper stated that she worked as a unit secretary in surgery at McDonough District Hospital until she quit in 2002. Other employment during her 26 years at the hospital encompassed different tasks and positions but mainly included office clerk, data entry, microfilming, medical records, adult day care, and public relations.

The ALJ asked Pepper about her physical impairments. Prior to December 31, 2007, Pepper testified that she had diabetes, hypothyroidism, allergies, asthma, angioedema, hives, neurocardiogenic syncope (fainting), bone spurs, arthritis in her lower back and left knee, bulging discs, mitral valve prolapse, a heart murmur,

aortic valve stenosis, and a hairline fracture in her right foot. Pepper's counsel stated that Pepper also had hypertension, high cholesterol, diabetes mellitus, migraine headaches, urticaria (hives), crossed eyes, and temporomandibular joint disorder (jaw pain).

The ALJ asked Pepper if these conditions affected basic work functions like standing and walking, to which Pepper said yes. Pepper testified that her back makes it difficult for her to sit "[f]or very long periods of time." She also said that her back causes her difficulty when lifting, carrying, and bending. Then, after Pepper described the doctors she saw for her various physical ailments,[3] the ALJ asked Pepper if any of the doctors put specific restrictions on her physical activities. Pepper said Dr. Max Rexroat, her podiatrist, gave her a walking limitation, but she could not provide more detail other than she was supposed to remain off her feet. Pepper also testified to weight gain as a side effect of the medications she took.

Pepper was asked about a typical day. Pepper said she gets up at about 8:00 or 8:30 a.m., takes her medications with her breakfast, and gets her husband's pills together. Pepper then turns her attention to her pets—one

---

[3] Pepper specifically testified that, to help alleviate her symptoms, she received physical therapy through the VA hospital, where she was treated by Dr. Lefler, an internist, about two to three times a month from 1982 until 2003. Pepper also stated that she was referred to Dr. White, an orthopedist, for her knee in 1998, but he did not recommend any treatment.

dog and four cats—from about 8:30 to 9:30. During that time, she feeds her animals and gives her dog his medication. After that, she takes her dog outside to play. She also gets a dog from a neighbor's house to play with her dog. Pepper said she cleans her cats' litter box during that time as well. Pepper spends the rest of the morning reading "papers."

Around noon, Pepper prepares lunch, which usually consists of "fix[ed] packaged stuff or TV dinners." During the afternoon hours, Pepper said she looks at more papers and magazines, talks on the phone with insurance companies, and tries to watch Oprah Winfrey's television show. While doing this, she stretches her back by bending over two pillows on her bed. She also uses this time to do laundry and visit her mother, who lives approximately 40 minutes away. She drives to see her mother one to three times a month. Around 4:30 p.m., Pepper brings in her pets and prepares dinner for herself and her husband. After dinner, Pepper spends the rest of the evening watching television, looking at more papers, and sorting through some boxes. She goes to bed around midnight.

The ALJ asked Pepper more general questions about her daily life. Pepper testified that she can dress herself but has trouble putting on her shoes, pants, and shorts. She is able to manage most of her personal hygiene; however, she cannot wash her hair or clip her toenails because she is unable to bend over in the bathtub. Pepper also testified to being able to grocery shop by herself, though her husband does the household dishes and

sweeping. Pepper does physical therapy exercises at home. She sees her family every few months at holidays like Thanksgiving and Christmas. Pepper testified that she prefers to go out to eat with friends or family only when given at least a week or two weeks' notice because she is afraid she might faint from fatigue. Pepper said she fainted approximately five times in 2007. She said her heart stops when she faints, and she worries that the people around her will not know what to do when it happens.

When asked if she had any psychological conditions, Pepper said she was diagnosed with depression and possibly post-traumatic stress disorder. She said she does not trust people and would "rather be with [her] animals than people." Pepper also has a fear of leaving her house because she is afraid of running into former co-workers. She does not belong to any social organizations or a church. Pepper said she received counseling for her psychological conditions during the relevant claim period, which included seeing someone with a Master's Degree in Counseling about every month for an hour. Pepper said she has trouble concentrating at home because there is always something else to be done. She also has problems sleeping.

Pepper was asked about her physical pain. She testified to having pain in her jaw joints, neck, and left lower back. She has trouble eating and chewing because of sharp pains she gets if she eats something chewy or opens her mouth too wide. She has neck pain on her left side that radiates into her armpit, elbow, and

fingers. This pain occurs when she does certain things
like sitting at the computer too long or lifting heavy
boxes. Pepper experiences back pain or muscle spasms
when she bends over or engages in a lot of activity.
She also has trouble kneeling. Heat, ice, medications,
and injections provide temporary relief.

Pepper testified that she can lift a 17-pound bag of dog
or cat food but tries not to lift more than 20 pounds.
Prior to 2007, Pepper estimated that, during an eight-
hour day, she could walk one mile in 30 minutes, three
times a day; stand for 15 minutes every hour; and sit
for an hour and a half, three times a day. She would
rather sit than stand, however, and walking on uneven
surfaces bothers her back and knee. Pepper has trouble
reaching the pedals in her car because of her height,
but she said she can drive the car and operate the
steering wheel without any problems—the limited range
of motion in her neck makes it difficult to see traffic
on her left side, but the condition has not caused
a traffic accident.

Pepper said her vision requires her to have a computer
monitor "real close" to her so she can see it, and her neck
requires it to be positioned to her right. She also has
migraines two to three times a month, which cause
"vomiting, nausea and troubles with sound and . . .
bright lights." Pepper said medicine makes them go
away, but that "[i]t usually takes the day and sometimes
into the next day." Pepper testified that her migraines
and depression would cause her to miss work more than
three days a month. Pepper also testified that she could

not do any of her former jobs because she was "mentally, emotionally, and physically exhausted" prior to 2007.

The ALJ questioned Frank Mendrick, a vocational expert (VE), at the end of the hearing. The ALJ asked the VE, hypothetically, whether Pepper would be able to perform any jobs if he found Pepper's testimony fully credible and all the impairments were supported by the medical evidence. The VE said no because Pepper claimed she would have to miss more than three days of work per month and that number is beyond what is normally provided to an employee. Pepper's counsel did not ask the VE any additional questions.

## C.  ALJ's Decision

The ALJ denied Pepper's claim on November 24, 2009. In the written decision, the ALJ followed the five-step process as outlined in 20 C.F.R. § 404.1520. At step one, he found that Pepper had not engaged in substantial gainful activity during the period before the alleged onset date, October 18, 2002, through her date last insured, December 31, 2007. At steps two and three, he found that Pepper had a combination of severe impairments—degenerative disc disease with sciatica, obesity, hypertension, hyperglycemia, hypothyroidism, vision problems, and asthma—but that none of them met or equaled an impairment in 20 C.F.R. §§ 404.1520(d), 404.1525, or 404.1526. The ALJ also found that Pepper's mental impairment of depression was not severe. At

step four, the ALJ determined that Pepper had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567, with the exception that she avoid concentrated exposure to pulmonary irritants and hazards. In making his RFC determination, the ALJ considered Pepper's various physical and mental impairments and the relevant medical records and testimony from Pepper. The ALJ also noted that Pepper's testimony regarding the "intensity, persistence, and limiting effects of [her] symptoms" was not fully credible. The ALJ then concluded that Pepper was capable of performing her past relevant work as a secretary, data entry clerk, and office clerk prior to December 31, 2007. As a result, Pepper was not under a disability prior to her date last insured, and her claim was denied.

The Appeals Council denied Pepper's request for review of the ALJ's decision on November 3, 2010, so the ALJ's ruling became the SSA's final decision on the matter. Pepper then filed this suit seeking review of the SSA's decision under 42 U.S.C. § 405(g). The district court ffirmed the ALJ's decision on March 29, 2012.

## II. DISCUSSION

Because we review the district court's affirmance *de novo*, we review the ALJ's decision directly.[4] *Jones v.*

---

[4] Pepper spends considerable time explaining how the district court made numerous mistakes when reviewing the
(continued...)

*Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). We will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). We will not, however, reweigh the evidence or substitute our judgment for that of the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, an ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted).

Pepper's appeal focuses on two main issues: the ALJ's RFC determination and the ALJ's credibility determination.

### A. Residual Function Capacity

Pepper challenges the ALJ's RFC determination on a number of grounds. At step four, the ALJ must determine the individual's RFC, or "what an individual can still do despite his or her limitations." S.S.R. 96-8p, 1996 SSR LEXIS 5, at *5. The RFC represents the maxi-

---

[4] (...continued)

ALJ's decision, but these contentions are irrelevant to our inquiry here.

mum a person can do—despite his limitations—on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *Id.* The ALJ in this case concluded that Pepper had the RFC to perform light work, with the caveat that she avoid concentrated exposure to pulmonary irritants and hazards. 20 C.F.R. § 404.1567(b) provides the definition for light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

We address each of Pepper's RFC challenges in turn.

### 1. Assessment of the Information

Pepper first argues that the ALJ's RFC determination was "erroneous" as a whole because the ALJ "merely summarized some of the medical evidence without assessment or discussion specifying how the medical and other evidence supported his conclusions," and there-

fore, it did not satisfy the requirements of S.S.R. 96-8p. We disagree. After setting forth his RFC determination, the ALJ provided a lengthy discussion of Pepper's testimony regarding all her impairments and the information in the medical records. The ALJ described Pepper's jaw, foot, chest, neck, and shoulder pains; her fear of near-fainting episodes; her respiratory issues; her mental impairments (mainly, depression); her migraines; her weight gain and obesity; and her vision problems. After doing so, he concluded that each of the impairments or ailments supported the light work limitation. This is consistent with our repeated assertion that "an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" *McKinzey*, 641 F.3d at 891 (quoting *Schmidt*, 395 F.3d at 744). The ALJ's discussion here was adequate.

To the extent Pepper argues that the decreased range of motion in her neck and her ability to sit for only a short period of time are inconsistent with the ALJ's RFC assessment, this argument is unconvincing. The only doctor to offer an opinion about Pepper's abilities that arguably could be inconsistent with her capacity to do light work was Pepper's cousin, Dr. Kafka, in 2003. But even Dr. Kafka did not explicitly opine that Pepper's impairments, individually or in the aggregate, prevented her from completing the *central* tasks of "light work:" lifting, walking, standing, and pushing and pulling with one's arms and legs. *See* 20 C.F.R. § 404.1567(b); *see also Diaz v. Chater*, 55 F.3d 300, 306-07 (7th Cir. 1995) (describing the evidence the ALJ considered in determining the claimaint had the RFC to do light and

sedentary work, including evidence of one doctor's opinion that the claimaint's impairments "affected his ability to reach, push, and pull"). The ALJ has the responsibility of resolving any conflicts between the medical evidence and the claimaint's testimony. *See Shauger v. Astrue*, 675 F.3d 690, 698 (7th Cir. 2012) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). He did that. Our task is to determine whether substantial evidence supports the ALJ's RFC conclusion. We believe that it does.

### 2. Migraine Headaches

Pepper's next argument is that the ALJ did not adequately consider her migraine headaches in determining her RFC. This argument is equally unavailing. The ALJ mentioned Dr. Fattal's October 2005 note regarding Pepper's complaint of migraines occurring about four times per year. The ALJ also mentioned Dr. Putman's note that Pepper complained of migraines in 2006, in addition to his observation that Pepper complained of migraines to Dr. Brody on numerous occasions. Pepper contends this was not sufficient because her migraines "occurred several times a month and in each instance incapacitated her for at least one day." But Pepper's medical records do not support that contention, and an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence. *See Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). The only medical record supporting Pepper's statement is a note

from August 2005 by Dr. Goodner that says, "[Patient] has migraine several times monthly, though she has now gone 3 months without one." In the diagnosis section, however, Dr. Goodner further states, "MIGRAINE—quiet for now, good relief with meds when they do occur[.]" This statement is in accordance with the rest of the medical evidence that indicates Pepper had migraine headaches approximately every few months and the symptoms were relieved with medication, which the ALJ appropriately found to be more credible than Pepper's testimony (as we address below). *See McKinzey*, 641 F.3d at 890 (credibility determinations must be supported by substantial evidence). To find support for this conclusion, one need look no further than the medical record notes from the months before and after Dr. Goodner's August 2005 note: Dr. Li wrote in her July 2005 note that Pepper said she has headaches "once every 3 to 4 month[s]"; and in October 2005, Dr. Fattal wrote that Pepper has "4 migraines per y[ea]r." This is not a situation like *Indoranto v. Barnhart*, 374 F.3d 470, 473-74 (7th Cir. 2004), where the ALJ failed to discuss "chronic severe headaches every day," or *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009), where the ALJ performed a cursory analysis and dismissed a line of evidence without any discussion. We believe the ALJ's discussion sufficiently addressed Pepper's migraine headaches and was supported by substantial evidence from the record.

### 3. Vision Problems

Pepper further contends the ALJ erred when discussing her vision limitations by only relying on a document that post-dated Pepper's date last insured and in not adequately explaining how Pepper's vision impairments are addressed in the RFC. Again, we disagree. First, the document at issue was from an examination with Dr. Brody on November 12, 2008. Dr. Brody stated that Pepper's eyesight with corrective lenses ranged from 20/20 to 20/30. This assessment is consistent with Dr. Brody's previous eye examinations of Pepper's eyesight from 1998 to 2007. Additionally, all but one of Pepper's documented eye impairments were present several years before Pepper stopped working in 2002, which the ALJ noted in his written decision. These included congenital esotropia, possible glaucoma, visual obscuration, nystagmus, and the effect of migraines. Mild cataracts were noticed in 2004, but they did not change Pepper's visual acuity. The ALJ also noted Pepper's complaints to Dr. Brody about her difficulty seeing small print, difficulty reading, seeing black spots and flashes, and seeing yellow, all of which occurred before Pepper's date last insured. We find no errors in the information the ALJ considered or the ALJ's explanation when addressing Pepper's vision limitations.

Furthermore, there is no evidence of Pepper's eye impairments substantially worsening or altering her ability to work during the relevant claim period, which could have altered the ALJ's determination. *See Eichstadt*, 534 F.3d at 666 (stating that certain conditions pre-

dating the claimant's insured status were irrelevant when evaluating the claimant's application for benefits because the claimant "was able to engage in substantial gainful employment during and after experiencing these problems"). Despite Dr. Brody's conclusion that Pepper had no depth perception and poor hand/eye coordination in 2008, there is no evidence of Dr. Brody ever opining that Pepper could not work due to her eye impairments. And similarly, Pepper does not direct us to any source or authority to support a contention that the effects of her vision impairments would prevent her from completing any job in the light work category. *Cf.* S.S.R. 85-15p, 1985 SSR LEXIS 20, at *20-21 ("As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels."). This information leads us to easily conclude that substantial evidence supports the ALJ's vision determination.

### 4. Obesity

We move to Pepper's contention that the ALJ violated S.S.R. 02-01p by not properly considering her obesity when formulating the RFC. *See* S.S.R. 02-01p, 2002 SSR LEXIS 1. The ALJ made a finding that Pepper's obesity is severe—i.e., "significantly limits [Pepper's] ability to

engage in work activity." Accordingly, the ALJ was required to discuss "any functional limitations resulting from the obesity" when formulating his RFC assessment. *See id.* at *19. We agree with Pepper that the ALJ did not specifically undertake such an analysis. We have held, however, that this type of error may be harmless when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). That is what occurred here.

The ALJ noted Dr. Kafka's 2003 observation that Pepper had decreased range of motion in her lumbar spine but that Pepper was overweight and it was difficult to fully evaluate her range of motion. The ALJ also discussed Dr. Li's 2004 assessment of Pepper's active problems: elevated liver enzymes, hyperlipidemia, hyperglycemia, and artificial menopause. Pepper complained to Dr. Li about weight gain, and each of those conditions can be aggravated by obesity. Furthermore, the ALJ described Dr. Putman's 2006 assessment of Pepper and her "active problems," which also included obesity. We believe these discussions, combined with Pepper's failure to specify how her obesity further impaired her ability to work, demonstrate that the ALJ adequately considered Pepper's obesity. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that the ALJ's failure to explicitly consider the claimant's obesity was inconsequential because the claimant did not specify how his obesity further impaired his ability to work and the ALJ addressed the limitations suggested by doctors

who otherwise considered the claimant's weight). Any error was therefore harmless.

### 5. Depression

Pepper's other arguments relating to the RFC focus on the ALJ's treatment of her depression. Her main contention is that the ALJ erred by failing to follow the procedure for evaluating mental limitations described in 20 C.F.R. § 404.1520a, known as the "special technique." This argument has some traction.

The special technique requires the ALJ to first determine whether a claimant has a medically determinable mental impairment(s). § 404.1520a(b)(1). This is done by evaluating the claimant's "pertinent symptoms, signs, and laboratory findings." *Id.* If the claimant has a medically determinable medical impairment, the ALJ must document that finding and rate the degree of function limitation in four broad "functional areas:" activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. § 404.1520a(c)(3); *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). These areas are known as the "B criteria." *See Craft*, 539 F.3d at 674 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00 *et. seq*).

The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The final area is rated on a four-point scale: none, one or two, three, four or more. *Id*. The rating assigned to each functional area corresponds to

a determination of severity of mental impairment. § 404.1520a(d)(1). If the impairment is considered severe, the ALJ must determine whether the impairment meets or is equivalent in severity to a listed mental disorder. § 404.1520a(d)(2). If the mental impairment neither meets nor is equivalent in severity to any listing, the ALJ will assess the claimant's RFC. § 404.1520a(d)(3). The ALJ must document his use of the technique, incorporating the relevant findings and conclusions into the written decision. § 404.1520a(e)(4). The decision must adequately discuss "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the [claimant's] mental impairment(s)." *Id.* The decision must include "a specific finding as to the degree of limitation in each of the functional areas[.]" *Id.*

The ALJ did not explicitly apply the special technique when evaluating Pepper's depression. This is clear from the written decision. The Commissioner concedes this point, instead arguing that Pepper was not harmed by this omission. Indeed, "[u]nder some circumstances, the failure to explicitly use the special technique may . . . be harmless error." *Craft*, 539 F.3d at 675. We agree with the Commissioner.

At step two, the ALJ made the required severe or not severe finding, concluding that Pepper's "mental impairment of depression" was not severe. He did not, however, integrate the requisite point scales into his decision or explicitly refer to the functional areas. None-

theless, we believe the ALJ provided enough informa-
tion to support the "not severe" finding. The ALJ cited
the absence of psychiatric or mental medical treatment
prior to the date last insured, Pepper's good response
to medication, and the aggravation of her condition by
her responsibilities at home. The record medical evi-
dence supports these assertions. For example, Hyde
stated that Pepper's depression in 2003 was stable on Paxil.
*See Prochaska*, 454 F.3d at 737 ("[C]ontrollable conditions
do 'not entitle one to benefits or boost one's entitlement
by aggravating another medical condition.'" (quoting
*Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004))). In
January 2004, Dr. Li noted Pepper complained of fatigue,
poor memory, poor concentration, irritability, being
tearful, and other symptoms; but her examination re-
vealed no abnormalities in Pepper's insight or judgment,
orientation, memory or impairment, and mood. In
October 2005, Pepper stated her mood was "fine." Exami-
nations by Dr. Putman in April 2006 and Dr. Li in
October 2007 also revealed that Pepper had appropriate
insight, judgment, mood, and affect. Even a May 2007
screening for depression was negative. The ALJ did not
fully comply with the special technique at this juncture,
but substantial evidence supports the ALJ's conclusion
at step two that Pepper's mental impairment was not
severe. Pepper was not harmed by the ALJ's misstep.

Likewise, as the Commissioner correctly points out,
the ALJ did not stop there when analyzing Pepper's
depression. After a "not severe" finding at step two, the
special technique requires the ALJ to assess the mental
impairment in conjunction with the individual's RFC

at step four. *See* § 404.1520a(d)(3). The ALJ did that here, concluding that Pepper's depression did not prevent her from completing light work. He cited Hyde's 2003 examination and Pepper's follow up with Dr. Li in 2004. He also referred to Pepper declining medication and counseling at her appointment with Dr. Goodner in August 2005 and failing to undergo significant depression treatment during the relevant claim period. In addition, the ALJ discussed information regarding Pepper's mental state outside of the specific paragraph addressing Pepper's depression medical records—Dr. Kafka's opinion that Pepper had "low self-esteem" in 2003, Dr. Putman's depression note in 2006, and Pepper's testimony regarding her mental state. Again, the ALJ did not make explicit findings referencing the four functional areas, but a plain reading of the ALJ's written decision demonstrates the ALJ generally discussed (1) Pepper's daily activities; (2) Pepper's mental state when around people; (3) Pepper's difficulty focusing when completing housework; and (4) the lack of evidence of any specific, periodic episodes of decompensation (i.e., a period of exasperated symptoms). In doing so, it is apparent the ALJ considered all the relevant information and factors required. *See* § 404.1520a(c)(1). Substantial evidence supports the ALJ's mental impairment finding at step four as well.

The ALJ's application of the special technique is not a model for compliance, but we will not remand a case for further specification when we are convinced that the ALJ will reach the same result. *See McKinzey*, 641 F.3d at 892. We believe that would occur in this case. The

ALJ's failure to explicitly apply the special technique was harmless.

For completeness, we briefly address Pepper's undeveloped arguments that the ALJ erred by (1) using his "hunches" to reach his conclusion that Pepper's depression was not severe; (2) failing to inquire as to why Pepper did not obtain treatment for her depression prior to her date last insured; and (3) ignoring the evidence of a depression diagnosis and treatment prior to Pepper's date last insured, which is corroborated by evidence that post-dates Pepper's date last insured.

First, we have already concluded that substantial evidence supports the ALJ's determination that Pepper's depression did not prevent her from performing light work; we do not see how the ALJ was "playing doctor," as Pepper insinuates. *Cf. Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). Next, why a claimant failed to undergo treatment is one factor to consider when assessing an impairment, but the burden was on Pepper to explain why she was disabled as a result of her depression. *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). Pepper failed to satisfy her burden. This is especially true considering Pepper was represented by counsel throughout the pendency of the proceedings. *See Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (explaining that "a claimant represented by counsel is presumed to have made his best case before the ALJ"). Lastly, as our previous discussion shows, we do not believe the ALJ ignored any pertinent information.

### B. Credibility Determination

Pepper's final argument is that the ALJ's credibility determination must be overturned. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. However, an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). A failure to do so could also be grounds for reversal. *See Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012).

Pepper contends the ALJ's explanation as to why he found Pepper's statements "not credible" was inadequate because the ALJ used boilerplate language in his opinion and, therefore, failed to provide a reasonable basis for his determination. The ALJ stated in part,

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above functional capacity assessment.

We acknowledge this is the same language we have repeatedly described as "meaningless boilerplate" because it fails to link the conclusory statements made with objective evidence in the record. *See, e.g., id.* at 645. It does not explain, or direct a reviewing court to, what the ALJ relied on when making his determination. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). However,

the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination. *See Shideler*, 688 F.3d at 311-12; *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). The ALJ did that here.

Immediately following the use of boilerplate, the ALJ provided a paragraph discussing Pepper's testimony in conjunction with the RFC statement. The ALJ acknowledged Pepper's ability to lift, stand, sit, and walk and how "each falls within the category of light work." The ALJ then described Pepper's testimony regarding her daily activities, which was corroborated by her husband, and the pain and symptoms exacerbated when Pepper sits or stands for extended periods of time or engages in "excessive bending." *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.") (internal citation omitted). He noted that Pepper's RFC did not require either. *See* S.S.R. 83-14, 1983 SSR LEXIS 33, at *6-7 ("[T]o perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on that particular job)."). The ALJ also discussed Pepper's testimony that her medication was

"somewhat effective" and she could maintain her ability to carry out daily activities by stretching and completing physical therapy exercises. Lastly, the ALJ explained how the only medical opinions regarding Pepper's ability to work prior to her date last insured were from state agency medical consultants after that date had passed. None of them opined that Pepper was disabled prior to her date last insured.

These references allow us to sufficiently examine what the ALJ relied on when concluding Pepper was not fully credible. *See Prochaska*, 454 F.3d at 738 (concluding that the ALJ appropriately considered diverse factors in his credibility determination, including the claimant's hearing testimony and the objective medical records, even though all the claimant's allegations were not discussed in the ALJ's written opinion). As we previously explained, Pepper testified to engaging in numerous activities throughout the course of an ordinary day that involved focused thinking and physical activity (e.g., driving at least 40 minutes to see her mom, reading papers and magazines, talking on the phone with insurance companies, shopping, and preparing meals). This testimony is in direct contrast to Pepper's repeated assertion that she could not engage in *any* of the activities required by her former employment, including sitting, standing, or concentrating. Furthermore, even some of the doctors who examined Pepper were confused as to why the medical examinations did not reveal the source of Pepper's symptoms. For example, Pepper argues that her neck pain and limited range of motion hindered her ability to work, but Dr. Goodner stated, "[Pepper's

symptoms] almost strike[] me as deliberate." (Only her cousin, Dr. Kafka, in 2003 affirmatively said there "appears to be no symptom magnification.") And the medical records likewise do not support Pepper's testimony regarding the frequency or effects of her migraines or fainting episodes, which seemed to form the basis for the VE's "no work" determination. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration.").

The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability. These are exactly the type of factors the ALJ was required to consider. *See* S.S.R. 96-7p, 1996 SSR LEXIS 4, at *7-8. It is true the ALJ could have been more specific as to which physical and mental impairments and symptoms he thought were exaggerated, as opposed to generally referencing large-scale portions of Pepper's daily-activity testimony, but that fact does not change the result here. The ALJ's explanation was sufficient to reasonably conclude that Pepper exaggerated the effects of her impairments. It also was not "patently wrong."

We find no errors in the ALJ's credibility determination.

### III. CONCLUSION

We acknowledge that Pepper's condition may have worsened since December 31, 2007, but the Social Security regulations require a "disability" finding before a claimant's date last insured. For the reasons discussed above, we AFFIRM the judgment of the district court and the ALJ's denial of benefits.