NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2014
Decided March 13, 2015

**Before**

DIANE P. WOOD, *Chief Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 14-2136

| | |
|---|---|
| LINDA F. GREEN,<br>      *Plaintiff-Appellant*, | Appeal from the United States District<br>Court for the Southern District of<br>Indiana, Indianapolis Division. |
| *v.* | No. 1:12-cv-01875-SEB-TAB |
| CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br>      *Defendant-Appellee*. | Sarah Evans Barker,<br>*Judge.* |

## O R D E R

Linda Green applied for disability benefits based on a combination of impairments that she asserted had the overall effect of preventing her from working. An administrative law judge concluded, however, that some of Green's alleged symptoms were not credible and that although other symptoms were severe, Green retained the residual functional capacity to perform her past job as a florist. The judge therefore denied her claim, and the Social Security Administration declined to take further action. Green appealed, first to the district court, which affirmed the agency's decision, and now to this court. She contends that the ALJ erred in those two critical findings. While a reasonable person may have seen things differently, we conclude that

substantial evidence supports the ALJ's credibility and residual-functional-capacity determinations, and we therefore affirm.

**I**

Green asserts that she first became disabled on June 30, 2008, at age 56, based on four primary sets of impairments. The first set involves two intestinal issues for which she was treated before her onset date. She was diagnosed in 2007 with a hernia, which was surgically repaired that year. Also that year, Dr. Michael Elmore diagnosed her with ulcerative proctosigmoiditis, a type of ulcerative colitis, or bowel inflammation. STEDMAN'S MED. DICTIONARY 1452 (2000); Bret A. Lashner, *Ulcerative Colitis*, CLEVELAND CLINIC, http://www.clevelandclinicmeded.com/medicalpubs/disease management/gastroenterology/ulcerative-colitis/ (last visited March 7, 2015, as were all websites cited in this order). Green told Dr. Elmore in late 2007 that "[s]he has very little abdominal pain unless she sits for long periods of time." He advised her to take Asacol to treat the inflammation. She reported no further intestinal issues after 2007.

Second, Green's medical records reveal a history and treatment of thyroid illnesses. In spring 2007, Dr. Brian Miles, her primary care physician, diagnosed her with Hashimoto's thyroiditis, and Dr. Michael Stack confirmed the diagnosis later that year. This is an autoimmune disease that inflames the thyroid, potentially reduces its function, and may result in constipation, difficulty concentrating or thinking, an enlarged neck, and fatigue. See *Chronic Thyroiditis*, NAT'L INST. OF HEALTH (May 10, 2014), http://www.nlm.nih.gov/medlineplus/ency/article/000371.htm. Her thyroiditis was treated with a thyroid hormone replacement; as a result, her level of thyroid stimulating hormone, which had been high (but still within normal range) returned to a lower level by July 2007. A year later another test showed the level to be well above the normal range, but it dropped substantially by April 2009 and was below the normal range in August. In October 2009, after her last date insured (March 31, 2009), Green reported sudden swelling in her neck and difficulty swallowing. Dr. Miles referred her to a specialist, and a biopsy revealed that Green had Non-Hodgkin's Lymphoma in her thyroid. She was treated with chemotherapy, which achieved "complete remission" about a half-year later, by May 2010.

Third, Green suffered from head pains. At doctors' visits throughout 2007, Green reported having headaches. In May 2009, Green visited Dr. Miles and reported pain in the back of her head and trouble with her memory. An MRI of her brain showed no abnormalities except for a few lesions that were consistent with migraine headaches. A

month later, Green reported to Dr. John Munshower, a neurologist, that, until two weeks earlier, she had had six months of daily, throbbing headaches. Dr. Munshower suggested a trial course of Topamax, after which the record reveals no further headache-related issues.

Finally Green was treated for musculoskeletal pain. First, in 2007, Dr. Michael Stack, a rheumatologist, treated her for polyarthralgia, or non-inflammatory pain in joints. See STEDMAN'S MED. DICTIONARY 149 (2000); *Joint Pain*, NAT'L INST. OF HEALTH (Apr. 18, 2014), http://www.nlm.nih.gov/medlineplus/ency/article/003261.htm. After noting that Green was obese and that the surgery to correct her hernia had decreased her activity, Dr. Stack found that some of her finger joints were swollen, her right knee showed popping and some slipping, and she had some osteoarthritis. But, he concluded, most of her complaints could be addressed with exercise. Second, in early 2008, Dr. Jeffery Whitaker, an orthopedist, and Dr. Miles both concluded that Green had bursitis in her left shoulder, and she received a cortisone injection for it. Third, Dr. Miles diagnosed her in the spring of 2008 with plantar fasciitis in her left heel, but Green declined a steroid shot to address any pain. Fourth, Dr. Miles found tenderness and swelling in both knees for which he prescribed Celebrex (which she later stopped taking because of side effects). Imaging, though, showed normal knees with "minimal spurring" on the left patella. Last, in April 2009, Green reported to Dr. Miles pain and difficulty in movement in her right shoulder. Dr. Miles diagnosed her with bursitis, and she accepted a steroid injection to treat it.

At a hearing before an ALJ, Green supplemented her medical records with testimony about her reduced physical and mental abilities. She reported that during the insured period, she owned three family flower shops and employed several people. But she eventually became extremely tired and would easily become confused, to the point where she could not drive without getting lost or take care of customers. On one occasion she failed to recognize her husband's voice. She testified that a doctor informed her she had been having "mini-strokes." Green recalled that she could not lift the five-gallon buckets in which the flowers were shipped, that her right hand hurt so much she could not turn doorknobs with it, and that she had frequent difficulty swallowing and breathing.

The ALJ also heard briefly from a vocational expert. The expert testified that, as generally performed, Green's work as a florist qualified as light work, but Green's own description included some as medium work.

The ALJ conducted the familiar five-step evaluation required by regulation, beginning with the first three steps. See 20 C.F.R. § 404.1520(a). At step one, the ALJ concluded that there was insufficient evidence to determine whether Green had engaged in substantial gainful activity during the insured period. (The ALJ could have denied benefits based on this insufficiency of proof, see 20 C.F.R. § 404.1512; *Callaghan v. Shalala*, 992 F.2d 692, 696 (7th Cir. 1993), but she did not rest her decision on this basis, and the government properly does not attempt to do so here. See *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).) At step two, the ALJ determined that Green had several severe impairments: Hashimoto's thyroiditis, plantar fasciitis, osteoarthritis, bursitis, obesity, and polyarthralgia. But, she added, there was insufficient evidence that the thyroid lymphoma or alleged mini-strokes produced medically determinable impairments during the insured period. At step three, the ALJ concluded that Green's severe impairments did not equal the severity of any of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.

Step four required the ALJ to determine Green's residual functional capacity. See 20 C.F.R. § 404.1545. The judge concluded that Green could engage in light work, including work as a florist as that job is generally performed. See 20 C.F.R. § 404.1567(b). She also found Green's asserted limitations not to be credible, reciting boilerplate that Green's statements about her limitations "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." But the ALJ also explained her conclusion more specifically, referring in particular to Green's asserted musculoskeletal and head pains. First, the judge noted that Dr. Stack had suggested that Green's joint pain could be dealt with through exercise; other than cortisone injections, she did not need significant treatment for the pain of her bursitis or plantar fasciitis; and imaging of her knees in fall 2008 revealed nothing particularly abnormal. Second, although Green reported daily migraines in May 2009 (for which she received Topamax), the neurologist's examination did not reveal any substantial abnormalities. Third, the ALJ added that two state medical consultants both concluded that "there was insufficient evidence to establish severe impairments prior to the claimant's date last insured."

After pursuing her administrative remedies, Green came to federal court. A magistrate judge recommended that her appeal be denied. The recommendation criticized the ALJ for failing to question the vocational expert more closely about Green's ability to perform past relevant work or other jobs. But Green does not ground her appeal in this criticism, and so any argument about it is waived. See *United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011). The district court adopted the magistrate

judge's recommendations and affirmed the denial of benefits to Green.

## II

On appeal Green challenges the ALJ's credibility finding on two grounds. First, she contends that the finding should be overturned because the ALJ used boilerplate language in concluding that her testimony about the severity of her pain was not credible. Green is correct that this boilerplate is not helpful and ought to have been omitted. See *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). But its inclusion here is harmless because the ALJ has "offer[ed] reasons grounded in the evidence" that support her determination. See *Filus*, 694 F.3d at 868; see also *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). First, Dr. Stack concluded that exercise could resolve much of Green's asserted joint pain. Second, beyond a cortisone shot, her doctors did not recommend any significant treatment for her left-shoulder bursitis or her plantar fasciitis. Third, various imaging tests of her legs and a neurologist's sensory exam did not confirm anything significant. Although, to be credible, the severity of a claimant's symptoms need not be supported by objective medical evidence, see 20 C.F.R. § 404.1529(c)(2)–(3); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005), here the ALJ disbelieved Green for reasons that go beyond the absence of objective evidence. Finally, the ALJ also relied on the analyses of two state medical consultants, who both found insufficient evidence of disabling impairments. The credibility finding is therefore grounded in meaningful evidence.

Green next argues that the ALJ misjudged her credibility about her asserted fatigue and inability to focus, problems that she attributes to her thyroid ailments. She contends that the ALJ should have analyzed together the effects of Hashimoto's thyroiditis (diagnosed in spring 2007, before the alleged onset date) and her thyroid lymphoma (diagnosed in November 2009, after the date last insured). But the possibility that these two diseases are related does not mean that either one (or both together) caused Green to be disabled during the insured period, which is what Green must show. See *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). The record, in fact, could fairly be read to show that she was not. During the insured period, to treat her thyroiditis Green took thyroid-replacement therapy, which kept her thyroid levels largely normal. And the lymphoma went into "complete remission." The ALJ thus properly based her credibility finding on "the lack of evidence available" regarding thyroid ailments before her date last insured. See *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). Nothing in the record suggests that this finding is "patently wrong." See *Shideler*, 688 F.3d at 310–11; *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Next Green contends that the ALJ erred in determining her residual functional capacity. Green accuses the ALJ of not considering the combined effects of her impairments, including her headaches and the pain in her shoulders, arms, and fingers. But the ALJ did consider these impairments and rejected them as non-disabling. The neurologist who treated her found no neurological abnormalities; the rheumatologist suggested that Green could alleviate her joint and muscle complaints through exercise; the orthopedist, after finding some decreased range of motion in her shoulder, administered a steroid shot for pain; and when she returned months later to her primary care physician with similar complaints, she needed no further, significant treatment. It is true that the ALJ did not mention that Green had reported having headaches or shoulder pain at several appointments. But "an ALJ need not mention every piece of evidence" as long as the ALJ has not "cherry-picked facts" to support her conclusion. See *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); see also *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). The ALJ here did not commit that sin.

Finally, Green argues that the ALJ failed to consider the effects of her intestinal conditions. She points to her ulcerative colitis and asserts that Dr. Elmore's note—that Green had "very little abdominal pain unless she sits for long periods of time"—has controlling weight as a treating specialist's opinion. But Green points to no evidence that her ulcerative colitis continued into the period after her alleged onset date; in fact the record suggests that her drug therapy largely removed her abdominal pain. And Dr. Elmore's note was part of the doctor's recital of his patient's reported history, not part of his assessment or medical opinion. See 20 C.F.R. § 404.1527(a)(2).

The judgment of the district court is AFFIRMED.